**[NOT YET SCHEDULED FOR ORAL ARGUMENT]**

No. 25-5268

# United States Court of Appeals
## *for the*
## District of Columbia Circuit

TODD M. HARPER,
in his personal capacity and in his official capacity as a Member of the National Credit Union Administration Board, *et al.*,
*Plaintiffs-Appellees*

v.

SCOTT BESSENT,
in his official capacity as Secretary of the Treasury, *et al.*,
*Defendants-Appellants*

From the United States District Court for the District of Columbia
Case No. 25-01294-AHA (Hon. Amir H. Ali)

**PLAINTIFFS-APPELLEES' ANSWERING BRIEF**

Vincent Levy
Jack L. Millman
Denis Metin
Daniel Fahrenthold
HOLWELL SHUSTER &
GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
Tel.: (646) 837-5151
vlevy@hsgllp.com

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Plaintiffs-Appellees certify the following information regarding the parties, rulings, and related cases in this appeal. D.C. Cir. R. 28(a)(1).

**A. Parties and Amici**

Plaintiffs-Appellees are Todd M. Harper and Tanya F. Otsuka, in their personal capacities and in their official capacities as Members of the National Credit Union Administration Board. Defendants-Appellants are Scott Bessent, in his official capacity as Secretary of the Treasury; Larry Fazio, in his official capacity as Executive Director of the National Credit Union Administration; Kyle S. Hauptman, in his official capacity as Chairman of the National Credit Union Administration Board; Trent Morse, in his official capacity as Deputy Assistant to the President and Deputy Director of the White House Office of Presidential Personnel, and Donald J. Trump, in his official capacity as President of the United States.

Jeffrey Moats filed an amicus brief in the district court.

The Arizona Legislature and the States of Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and West Virginia filed an amicus brief in this Court.

There have been no intervenors.

**B. Rulings under Review**

The ruling under review is a summary judgment order, JA104, and opinion, JA77, that the district court (Judge Amir H. Ali) issued on July 22, 2025, reinstating Plaintiffs-Appellees to their positions as members of the National Credit Union Administration.

**C. Related Cases**

Counsel for Plaintiffs-Appellees state that, to the best of their knowledge, this case has not previously been before this or any other court, and they are not aware of any related cases.

*/s/ Vincent Levy*
Vincent Levy
HOLWELL SHUSTER &
GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
Tel.: (646) 837-5151
vlevy@hsgllp.com

# TABLE OF CONTENTS


INTRODUCTION .......... 1

STATEMENT OF THE CASE .......... 3

A. Historical Background .......... 3

1. The Pre-Revolutionary Tradition of Insulating Financial-Institution Superintendents. .......... 3

2. English Oversight of Predecessors of American Credit Unions. .......... 4

3. The Transplantation of Friendly Societies to Colonial America. .......... 7

4. American Adoption of English Tradition for Financial Officials. .......... 8

5. The Second Bank of the United States. .......... 9

6. The Rise of State Banking Oversight. .......... 10

B. Federal Statutory Background. .......... 12

1. Depression-Era Reform and the Federal Credit Union Act. .......... 12

2. The Creation and Restructuring of the NCUA. .......... 14

C. The NCUA Functions as a Central Bank for Credit Unions. .......... 19

D. The President Fires Plaintiffs Without Cause. .......... 20

E. The District Court Enters Permanent Relief for Plaintiffs. .......... 21

SUMMARY OF THE ARGUMENT .......... 23

ARGUMENT .......... 25

I. Plaintiffs' Removal Violates the NCUA Organic Statute. .......... 25

A. The Statute Gives For-Cause Protection. .......... 25

B. The Government's Arguments Fail. .......... 33

II. The NCUA Board's Removal Protections are Constitutional. .......... 34

A. The NCUA Shares the Federal Reserve's Historical Pedigree, Institutional Design, and Market-Stabilizing Function .....35

B. The NCUA's Enforcement Powers Confirm Rather Than Undermine the Constitutionality of its Independence .....40

C. Any Unconstitutional Authority Is Severable .....44

III. The District Court Properly Ordered Reinstatement of Plaintiffs .....46

A. The District Court Had Authority to Grant Injunctive Relief Ordering *De Facto* Reinstatement .....46

B. The Equities and Public Interest Favor Plaintiffs .....49

C. Even If the Court Lacked Injunctive Power, Plaintiffs Would Be Entitled to the Same Relief at Law .....51

CONCLUSION .....54

## TABLE OF AUTHORITIES*

**Cases** **Page(s)**

*Andrade v. Lauer*,
729 F.2d 1475 (D.C. Cir. 1984)....53

*Baker v. Carr*,
369 U.S. 186 (1962)....49

*BNSF Ry. Co. v. Loos*,
586 U.S. 310 (2019)....30

*Bowsher v. Synar*,
478 U.S. 714 (1986)....45

*California v. Cabazon Band of Mission Indians*,
480 U.S. 202 (1987)....28

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024)....39

*Commonwealth v. President of the Farmers & Mechanics Bank*,
21 Pick. 542 (Mass. 1839)....11

*Dellinger v. Bessent*,
2025 WL 559669 (D.C. Cir. Feb. 15, 2025)....48

*Dellinger v. Bessent*,
2025 WL 887518 (D.C. Cir. Mar. 10, 2025)....50

*Elrod v. Burns*,
427 U.S. 347 (1976)....47

*Fischer v. United States*,
603 U.S. 480 (2024)....31

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010)....43

* Authorities upon which we chiefly rely are marked with an asterisk.

*Great Lakes Dredge & Dock Co. v. Huffman*,
319 U.S. 293 (1943) ....................................................................................49

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) ....................................................................................49

*Gundy v. United States*,
588 U.S. 128 (2019) ....................................................................................31

*Harcourt v. Fox*,
(1692) 89 Eng. Rep. 680 (K.B.) .....................................................................6

*Harris v. Bessent*,
775 F. Supp. 3d 164 (D.D.C. 2025) .............................................................49

*Hazardous Waste Treatment Council v. EPA*,
861 F.2d 270 (D.C. Cir. 1988).......................................................................32

*Humphrey's Executor v. United States*,
295 U.S. 602 (1935) ........................................................................ 18, 23, 48

*In re Sawyer*,
124 U.S. 200 (1888) ....................................................................................52

*Johnson v. Manhattan Ry. Co.*,
289 U.S. 479 (1933) ....................................................................................53

*Kalaris v. Donovan*,
697 F.2d 376 (D.C. Cir. 1983).......................................................................33

*Kalbfus v. Siddons*,
42 App. D.C. 310 (D.C. Cir. 1914) ...................................................... 52, 53

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)..........................................................................50

*Leopold v. Manger*,
102 F.4th 491 (D.C. Cir. 2024) .....................................................................54

*Marbury v. Madison*,
5 U.S. 137 (1803) ........................................................................................52

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ....................................................................................27

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1867) .....................................................................47

*Muscogee (Creek) Nation v. Hodel*,
851 F.2d 1439 (D.C. Cir. 1988)..................................................................32

*Myers v. United States*,
272 U.S. 52 (1926) ....................................................................................48

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
413 U.S. 405 (1973) ..................................................................................33

*People ex rel. Van Voast v. Van Slyck*,
4 Cow. 297 (N.Y. Sup. Ct. 1825) ...............................................................53

*Reagan v. United States*,
182 U.S. 419 (1901) ..................................................................................29

*Sampson v. Murray*,
415 U.S. 61 (1974) .............................................................................. 47, 49

**Seila Law LLC v. CFBP*,
591 U.S. 197 (2020) ........................................................... 33, 36, 44, 45

**Severino v. Biden*,
71 F.4th 1038 (D.C. Cir. 2023) ........................................... 25, 27, 32, 46, 47, 48

*Shurtleff v. United States*,
189 U.S. 311 (1903) ..................................................................................29

*Sibley v. Obama*,
866 F. Supp. 2d 17 (D.D.C. 2012)..............................................................53

*Stone v. INS*,
514 U.S. 386 (1995) ..................................................................................32

**Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996)..... 16, 17, 26, 30, 31, 35, 36, 37, 38, 47, 48, 51, 54

*Trump v. Boyle*,
145 S. Ct. 2653 (2025) ....................................................................................49

**Trump v. Cook*,
146 S. Ct. 2234 (2026) ......................... 2, 9, 10, 12, 13, 27, 29, 34, 36, 37, 38, 39, 40, 42, 46, 48, 51

**Trump v. Slaughter*,
146 S. Ct. 2283 (2026) ................................................................ 1, 35, 36, 43, 44

*Trump v. Wilcox*,
145 S. Ct. 1415 (2025) ......................................................................... 39, 49, 50

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) .................................................................................... 44, 45

*United States v. Booker*,
543 U.S. 220 (2005) ..........................................................................................44

*United States v. Rahimi*,
602 U.S. 680 (2024) ..........................................................................................42

*United States v. Salerno*,
481 U.S. 739 (1987) ..........................................................................................46

*United States v. Wilson*,
290 F.3d 347 (D.C. Cir. 2002)...........................................................................32

*Vitarelli v. Seaton*,
359 U.S. 535 (1959) ..........................................................................................47

*Webster v. Doe*,
486 U.S. 592 (1988) ..........................................................................................47

*White v. Berry*,
171 U.S. 366 (1898) ..................................................................................... 49, 52

*Wiener v. United States*,
357 U.S. 349 (1958) ................................................................................ 18, 26, 48

*Ysleta del Sur Pueblo v. Texas*,
596 U.S. 685 (2022) ..................................................................................... 27, 28

**Statutes**

12 U.S.C. §1752a ........ 17, 18, 30

12 U.S.C. §1755 ........ 19, 39

12 U.S.C. §1757 ........ 19, 39

12 U.S.C. §1766 ........ 6

12 U.S.C. §1781 ........ 20

12 U.S.C. §1782 ........ 20, 38, 39

12 U.S.C. §1786 ........ 19, 38, 42

12 U.S.C. §1787 ........ 19, 38

12 U.S.C. §1790e ........ 20

12 U.S.C. §1795 ........ 20, 38

12 U.S.C. §1795k ........ 38, 40

12 U.S.C. §1813 ........ 19, 20, 42

12 U.S.C. §1818 ........ 42, 43

12 U.S.C. §1821 ........ 19, 20

12 U.S.C. §1844 ........ 41

12 U.S.C. §222 ........ 20

12 U.S.C. §243 ........ 19

12 U.S.C. §244 ........ 19

12 U.S.C. §248 ........ 41, 43

12 U.S.C. §357 ........ 19, 39

1849 Mass. Acts 157 ........ 11

31 U.S.C. §9101 ........ 20, 40

Act of Feb. 23, 1838 .......... 11

Act of Feb. 25, 1791 .......... 9

Act of May 2, 1849 .......... 11

Banking Act of 1933 .......... 13

Banking Act of 1935 .......... 13

D.C. Code §16-3501 .......... 53

Mass. Acts 1909 .......... 12

**Legislative Materials**

116 Cong. Rec. 2417 (1970) .......... 14, 36

123 Cong. Rec. 27,396 (1977) .......... 16, 27

124 Cong. Rec. 38,842 (1978) .......... 20

H.R. Rep. 95-1383, 95th Cong., 2d Sess. (1978) .......... 27, 30

H.R. Rep. No. 2021, 73d Cong., 2d Sess. (1934) .......... 13

H.R. Rep. No. 95-217 (1977) .......... 18

Pub. L. No. 101-73, 103 Stat. 183 (1989) .......... 41, 45

Pub. L. No. 106-544 .......... 43

Pub. L. No. 73-467, 48 Stat. 1216 .......... 13, 14, 15

Pub. L. No. 91-206, 84 Stat. 49 .......... 14, 15, 18, 26, 30

Pub. L. No. 95-630, 92 Stat. 3641 .......... 16, 45

S. Rep. No. 555, 73d Cong., 2d Sess. (1934) .......... 13

S. Rep. No. 94-751, 94th Cong., 2d Sess. (1976) .......... 16, 17, 31

S. Rep. No. 95-1273 (1978) .......... 20

**Executive and Administrative Materials**

Exec. Order No. 9148, 7 Fed. Reg. 3145 (Apr. 30, 1942) .......................................14

Nat'l Credit Union Admin., 1999 Annual Report (1999).......................................12

U.S. Dep't of Labor, Bureau of Labor Statistics, Bull. No. 314 .............................12

U.S. Gen. Accounting Office, *Credit Unions: Reforms for Ensuring Future Soundness*, GAO/GGD-91-85 (1991).........................................................................12

**Other Authorities**

12 & 13 Will. III, c.2, *reprinted in* THE STATUTES AT LARGE: FROM MAGNA CHARTA TO THE END OF THE ELEVENTH PARLIAMENT OF GREAT BRITAIN 205 (Danby Pickering ed., Vol. XXXIX, 1793)..........................................................6

3 W. Blackstone, Commentaries on the Laws of England .....................................52

33 Geo. III., c.54, *reprinted in* THE STATUTES AT LARGE: FROM MAGNA CHARTA TO THE END OF THE ELEVENTH PARLIAMENT OF GREAT BRITAIN 205 (Danby Pickering ed., Vol. XXXIX, 1793)................................................. 5, 6, 7, 13, 14

*A Return to the Traditional Use of the Writ of Mandamus*, 24 Lewis & Clark L. Rev. 1527 (2020)...........................................................52

Alexander Hamilton, Report on a National Bank (Dec. 13, 1790) ...........................8

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 256 (2012)...............................................................................32

*Articles and Regulations of the Friendly Society of Tradesmen, House Carpenters, in the City of New-York* (Mar. 10, 1767)..................................................7

Claudia Levy, *Nickerson Successor Expected in Few Weeks, White House Says*, Wash. Post (Mar. 13, 1976) ......................................................................15

*Community Credit Needs: Hearings Before the Subcomm. on Fin. Insts. Supervision, Regul. & Ins. of the H. Comm. on Banking*, Fin. & Urb. Affs., 95th Cong. 385 (1978)...............................................................................20

*Cooperative Credit Societies (Credit Unions) in America and in Foreign Countries* 17 (1922)...........................................................................12

Douglass C. North & Barry R. Weingast, *Constitutions and Commitment: The Evolution of Institutions Governing Public Choice in Seventeenth-Century England*, 49 J. Econ. Hist. 803 (1989) ............................................................3, 4

Early American Imprints, Series I, Evans (1639-1800) ..........................................7

Erdis W. Smith, *Federal Credit Unions: Origin and Development* (Nov. 1955)….5, 7, 12

Hugh Barty-King, THE WORST POVERTY: A HISTORY OF DEBT AND DEBTORS 165 (Budding Books 1997) ..........................................................................................5

Jay B. Sykes, *Federal Preemption in the Dual Banking System: An Overview and Issues for the 116th Congress*, CRS Report No. R45726 (2019)........................10

John Clapham, THE BANK OF ENGLAND: A HISTORY vol. 1 (1944) ..........................4

Kevin Butterfield, THE MAKING OF TOCQUEVILLE'S AMERICA: LAW AND ASSOCIATION IN THE EARLY UNITED STATES (2015) ............................................7

Kris James Mitchener & Matthew Jaremski, *The Evolution of Bank Supervision: Evidence from U.S. States* (Nat'l Bureau of Econ. Research, Working Paper No. 20603, 2014).................................................................................................11

Lev Menand, *Why Supervise Banks? The Foundations of the American Monetary Settlement*, 74 Vand. L. Rev. 951 (2021) ...................................................11

Mass. Div. of Banks, 2017 Annual Report (2017) ................................................11

Moshe Arye Milevsky, THE DAY THE KING DEFAULTED: FINANCIAL LESSONS FROM THE STOP OF THE EXCHEQUER IN 1672 (Springer/Palgrave Macmillan 2017)........3

*Restructuring the National Credit Union Administration: Hearing on S. 1475 Before the Subcomm. on Fin. Insts. of the S. Comm. on Banking, Hous. & Urb. Affs.*, 94th Cong. 10 (1976) ........................................................................15

Roger Lowenstein, AMERICA'S BANK: THE EPIC STRUGGLE TO CREATE THE FEDERAL RESERVE (Penguin Press 2015)...........................................................8

Saikrishna Prakash & Steven D. Smith, *How to Remove a Federal Judge*, 116 Yale L.J. 72 (2006)..................................................................................................6

Simon Cordery, BRITISH FRIENDLY SOCIETIES, 1750-1914 (Palgrave Macmillan 2003) ....................5

*The Cost of the Savings and Loan Crisis: Truth and Consequences*, 13 FDIC Banking Rev. 26 (Dec. 2000) ....................41

*The Influence of the Writ of Mandamus in Federal Personnel Litigation*, 45 Geo. L.J. 388 (1957) ....................51

THE PAPERS OF ALEXANDER HAMILTON 305 (Harold C. Syrett ed., 1963) ....................8

THE STATUTES AT LARGE: FROM MAGNA CHARTA TO THE END OF THE ELEVENTH PARLIAMENT OF GREAT BRITAIN 205 (Danby Pickering ed., Vol. XXXIX, 1793) 5

THE STATUTES AT LARGE: FROM THE EIGHTH YEAR OF KING WILLIAM III TO THE SECOND YEAR OF QUEEN ANNE 357 (Danby Pickering ed., Vol. X, 1764) ....................4

Thomas Blount, NOMO-LEXIKON: A LAW-DICTIONARY (1670) ....................4, 6

Thomas Smith, DE REPUBLICA ANGLORUM (1583) ....................4, 6

## GLOSSARY OF TERMS

| **Term or Abbreviation** | **Definition** |
|---|---|
| CFPB | Consumer Financial Protection Bureau |
| CLF | Central Liquidity Facility |
| Dist. Ct. Dkt. | Docket entries from *Harper v. Bessent*, No. 25-cv-01294-AHA (D.D.C. Apr. 28, 2025) |
| EPA | Environmental Protection Agency |
| FDIC | Federal Deposit Insurance Corporation |
| FIRREA | Financial Institutions Reform, Recovery, and Enforcement Act |
| Gov't Br. | Appellant Brief, *Harper v. Bessent*, Doc. No. 2134621, No. 25-05268 (D.C. Cir. Sept. 12, 2025) |
| INS | Immigration and Naturalization Service |
| JA | Joint Appendix, *Harper v. Bessent*, Doc. No. 2134622, No. 25-05268 (D.C. Cir. Sept. 12, 2025) |
| NCUA | National Credit Union Administration |
| PCAOB | Public Company Accounting Oversight Board |

## INTRODUCTION

The district court properly held that President Trump unlawfully removed without cause two members of the National Credit Union Administration's Board. The NCUA is an "independent Federal Agency" that supervises and acts as a central bank to federally chartered credit unions, analogous to the Federal Reserve Board's mandate for banks. The two agencies play very similar roles: beyond regulating the financial institutions under their supervision (including by policing lending rates), both act as lenders-of-last resort to those institutions. The district court held that, in view of the statutory text, context, and structure, and given the analogous mandates of the NCUA and the Federal Reserve, members of the NCUA Board could not be removed without cause, such removal protections are constitutional, and the court had the power to order reinstatement. The Government appealed, and the case was held in abeyance pending the Supreme Court's decision in *Trump v. Slaughter*.

The district court was correct, and the Supreme Court's decisions in *Slaughter* and *Trump v. Cook* confirm the soundness of its decision. In *Slaughter*, the Court stated that the President may lack unlimited removal authority with respect to entities that "follow[] in the distinct historical tradition of the First and Second Banks of the United States" like "the Federal Reserve." 146 S. Ct. 2283, 2306 (2026). And in *Cook*, the Court confirmed for-cause removal protections were constitutional for the Federal Reserve, including based on context and how the statute was interpreted at

the time of enactment. 146 S. Ct. 2234, 2252-53 (2026). The Court also held a court could reinstate an officer via a preliminary injunction. *Id.* at 2250.

Remarkably, the Government opted to stand on its opening brief, which it filed before *Slaughter* and *Cook*—and which fails to mention the Federal Reserve at all. The Government's brief ignores the key statutory and constitutional issues in this case, and its arguments cannot be reconciled with Supreme Court precedent. For instance, the Government contends "only two exceptions" to the President's removal power exist (certain inferior officers and *Humphrey's*), Gov't Br. 16, but this ignores *Cook*'s instructions, which recognize that, even without *Humphrey's*, Congress may constitutionally limit the President's power to remove members of agencies "consistent with the principles that underpin the First and Second Banks," like the Federal Reserve. *Cook*, 146 S. Ct. at 2254.[1] Or consider the Government's lengthy argument that courts lack any reinstatement authority, Gov't Br. 26-34, which ignores the Supreme Court's reinstatement of Lisa Cook, *Cook*, 146 S. Ct. at 2250.

The Court should affirm the district court's decision.

---

[1] Unless otherwise noted, all internal quotation marks, citations, and alterations have been omitted from quotations.

# STATEMENT OF THE CASE

## A. Historical Background.

### 1. The Pre-Revolutionary Tradition of Insulating Financial-Institution Superintendents.

The English tradition of protecting certain officials from at-will removal by the Crown begins with one of the worst financial crises in recorded history. In 1672, King Charles II abruptly suspended all payments on Crown debt, in what became known as the "Stop of the Exchequer," leading to significant defaults on obligations to private goldsmith-bankers.[2] The consequences were devastating. Major financial institutions collapsed, day-to-day commerce ground to a halt, and widespread financial panic followed.[3] This episode exposed a fundamental structural weakness in financial governance.[4] When the sovereign's financial stewards served at the Crown's pleasure, the King could commandeer public resources and thus destabilize financial institutions, markets, and the economy writ large.[5]

Parliament responded by insulating officials with control over financial institutions. Parliament chartered the Bank of England (the historic predecessor to the Federal Reserve) in 1694 as a joint-stock company, and made its "Court of

[2] Moshe Arye Milevsky, THE DAY THE KING DEFAULTED: FINANCIAL LESSONS FROM THE STOP OF THE EXCHEQUER IN 1672, at 1-12 (Springer/Palgrave Macmillan 2017).
[3] *Id.*
[4] Douglass C. North & Barry R. Weingast, *Constitutions and Commitment: The Evolution of Institutions Governing Public Choice in Seventeenth-Century England*, 49 J. Econ. Hist. 803, 812-17 (1989).
[5] *Id.*

Directors" elected by private shareholders—not appointed by the Crown—ensuring that the institution entrusted with managing the national debt would operate independent of the sovereign's command.[6] Parliament also afforded various Exchequer officials, including its highest-ranking officers, the Barons, protection from at-will removal by the Crown, ensuring that those entrusted with safeguarding the public fisc could carry out their duties free from political interference.[7]

These reforms ensured that the Government could "commit credibly to upholding property rights" and honoring its financial obligations—a design whose "success was remarkable, as the evidence from capital markets shows,"[8] thus sustaining the public's confidence in the nation's financial system.[9]

2. English Oversight of Predecessors of American Credit Unions.

When Parliament later moved to regulate cooperative financial institutions known as "friendly societies"—predecessors of modern American credit unions—it similarly entrusted their oversight to officials insulated from removal by the

---

[6] John Clapham, THE BANK OF ENGLAND: A HISTORY vol. 1, at 1-12, 18-20, 53-60 (1944).
[7] Douglass C. North, *supra*, at 817; 12 & 13 Will. III, c.2, §3, *reprinted in* THE STATUTES AT LARGE: FROM THE EIGHTH YEAR OF KING WILLIAM III TO THE SECOND YEAR OF QUEEN ANNE 357, 360 (Danby Pickering ed., Vol. X, 1764); *see also* Thomas Smith, DE REPUBLICA ANGLORUM bk. II, ch.14 (1583) (Barons were "the chiefe for the accounts of the Prince"); Thomas Blount, NOMO-LEXIKON: A LAW-DICTIONARY, s.v. "Baron" (1670) (the Barons' "Office is to look to the Accompts of the Prince" and "to decide all Causes appertaining to the Kings Revenue").
[8] Douglass C. North, *supra*, at 803, 805.
[9] *Id.* at 817-19.

Crown.[10] Friendly societies, which emerged in mid-to-late 18th century England, pooled savings to provide financial assistance, offer basic financial security, and help working-class members purchase or build homes.[11]

As these friendly societies grew in popularity, the Crown moved to bring them under formal regulation in the Friendly Societies Act of 1793, enacted for "the protection and encouragement of friendly societies in [the Great British] kingdom."[12] In addition to formally recognizing them, "for the purpose of raising, from time to time, by subscriptions of the several members of every such society, or by voluntary contributions, a stock or fund," the Act subjected friendly societies to formal regulation by Crown officials.[13] Among other things, the Act required friendly societies to register internal "rules, orders, and regulations" with "the clerk of the peace," and to establish committees and appoint officers—such as trustees and treasurers—empowered to invest pooled assets in Crown securities.[14] In exchange, societies received tax-exempt status and formal legal standing.[15]

---

[10] Erdis W. Smith, *Federal Credit Unions: Origin and Development*, 18 Soc. Sec. Bull. 3 (Nov. 1955).

[11] Simon Cordery, BRITISH FRIENDLY SOCIETIES, 1750-1914 at 12-29 (Palgrave Macmillan 2003); Hugh Barty-King, THE WORST POVERTY: A HISTORY OF DEBT AND DEBTORS 165 (Budding Books 1997).

[12] 33 Geo. III., c.54. §1, *reprinted in* THE STATUTES AT LARGE: FROM MAGNA CHARTA TO THE END OF THE ELEVENTH PARLIAMENT OF GREAT BRITAIN 205 (Danby Pickering ed., Vol. XXXIX, 1793).

[13] *Id.*

[14] *Id.* §§1-2, 5-7.

[15] *Id.* §§4, 9.

Importantly, Parliament vested regulatory oversight of these cooperative financial institutions in officials who could be removed by the Crown only for cause. Chief among them was the "clerk of the peace," who exercised oversight over numerous financial and economic matters and performed regulatory roles in areas such as alehouse licensing and county taxation, and held office by statute "so long time only, as such clerk of the peace shall well demean himself in his said office."[16] The clerk of the peace was tasked with chartering friendly societies after reviewing their internal governing documents for compliance with the Act.[17] The clerk of the peace also supervised the fidelity-bond requirement; these bonds were "given to the clerk of the peace," who could "sue upon such bond in the name of the clerk of the peace" for the benefit and "use of the said society" in cases of fraud or embezzlement.[18]

The Act also vested some oversight in the Crown's chief purse, the Exchequer,[19] particularly its Barons, who—though appointed by the King and serving both judicial and regulatory functions, were not subject to removal at his pleasure.[20] Among their oversight roles, the Barons, upon petition by friendly-

[16] Saikrishna Prakash & Steven D. Smith, *How to Remove a Federal Judge*, 116 Yale L.J. 72, 96 (2006) (discussing *Harcourt v. Fox*, (1692) 89 Eng. Rep. 680 (K.B.)).
[17] 33 Geo. III., c.54, §§1-2.
[18] *Id.* §4; *cf.* 12 U.S.C. §1766(h).
[19] 33 Geo. III., c.54. §8.
[20] 12 & 13 Will. III, c.2, §3; Thomas Smith, *supra*, at ch.14; Thomas Blount, *supra*.

society members alleging trustee malfeasance, were required to appoint counsel to act for the society and pursue recovery of misappropriated funds in court.[21]

3. The Transplantation of Friendly Societies to Colonial America.

The English tradition of friendly societies took root in colonial America, where similar cooperative institutions arose to serve working people with shared trade or communal ties.[22] These American friendly societies also pooled member contributions to provide mutual aid, financial security, and assistance in times of hardship. Among the earliest was the Friendly Society of Tradesmen, House Carpenters, organized in New York City in 1767, which established a system of member subscriptions and rotating benefits designed to support fellow craftsmen.[23] These early American friendly societies, like their predecessors, operated as grassroot financial cooperatives organized around principles of mutual obligation and democratic self-governance.[24]

---

[21] 33 Geo. III., c.54. §9.

[22] Kevin Butterfield, THE MAKING OF TOCQUEVILLE'S AMERICA: LAW AND ASSOCIATION IN THE EARLY UNITED STATES 160-63 (2015) (explaining that mutual-benefit societies existed in colonial British America and that British precedents supplied models for American organizations).

[23] *Articles and Regulations of the Friendly Society of Tradesmen, House Carpenters, in the City of New-York* art. VII (Mar. 10, 1767), Early American Imprints, Series I, Evans (1639-1800).

[24] Kevin Butterfield, *supra*, at 160-63; Erdis W. Smith, *supra*, at 3-4.

4. American Adoption of English Tradition for Financial Officials.

Following the Revolutionary War, and with the Republic still reeling from the economic disarray of the Confederacy, the founders set out to build a stable financial regime informed by English tradition, including of insulated financial stewards.[25]

Inspired in significant part by the Bank of England—an institution shaped by reforms following the Stop of the Exchequer—Alexander Hamilton spearheaded the creation of the First Bank of the United States.[26] Although a staunch proponent of an "energetic executive," Hamilton recognized that executive power must yield when financial stability is at stake: He warned that placing too much oversight of the bank "at the disposal of the Government" would invite "calamitous abuse" over time, for "what Government ever uniformly consulted its true interest, in opposition to the temptations of momentary exigencies?" and "what nation was ever blessed with a constant succession of upright and wise Administrators?"[27] Hamilton argued that to avoid such abuse the bank's oversight should be structured so that it is not "subservient to party views," which would in turn "render the public confidence more firm, stable, and unqualified."[28]

---

[25] Alexander Hamilton, Report on a National Bank (Dec. 13, 1790), in 7 THE PAPERS OF ALEXANDER HAMILTON 305, 307 (Harold C. Syrett ed., 1963); Roger Lowenstein, AMERICA'S BANK: THE EPIC STRUGGLE TO CREATE THE FEDERAL RESERVE 2 (Penguin Press 2015).
[26] Roger Lowenstein, *supra*, at 2.
[27] Alexander Hamilton, *supra*, at 307.
[28] *Id.*

Congress ultimately adopted Hamilton's design for a "bank for the United States," and tasked it with providing "security for an upright and prudent administration" of "the national finances" to create "considerable advantages to trade and industry."[29] Notably, while the President could appoint its board, he could not remove its members.[30] *Cook*, 146 S. Ct. at 2254 (explaining that the founders "guaranteed [the First Bank's] independence from Presidential control").

5. The Second Bank of the United States.

After the First Bank's charter expired in 1811, severe financial instability followed in the wake of the War of 1812. *Id.* at 2243. That led to the chartering of the Second Bank of the United States in 1816—"encouraged even by President Madison, previously an ardent foe" of national banking. *Id.* at 2243-44.

Like the First Bank, the Second Bank "was not to be controlled by the Federal Government that brought it into existence." *Id.* Of its twenty-five directors, only five were appointed and removable by the President; "the remaining 20 were appointed by and accountable only to private stockholders." *Id.* This structure insulated the Second Bank from presidential pressure. *Id.* at 2254 (explaining that the Founders "guaranteed [the First Bank's] independence from Presidential control" and "[t]heir successors did the same for the Second Bank").

---

[29] Act of Feb. 25, 1791, ch.10, §4, 1 Stat. 191, 191.
[30] *Id.* § 4, 1 Stat. at 192-93.

For political reasons, the Second Bank's independence "was to prove its downfall." *Id.* at 2244. Unlike Madison, Andrew Jackson "would not change his mind on the wisdom of a national bank, at least one he could not control." *Id.* So in 1832, when Congress extended the Second Bank's charter, Jackson vetoed it. *Id.*

6. The Rise of State Banking Oversight.

When the Second Bank's charter expired in 1836, it brought an end to the "great regulating wheel" of the early American financial system—the federal "watchdog over state banks and the economy." *Cook*, 146 S. Ct. at 2254. The consequences were swift and devastating. Without an independent central bank, "there was no way to contain the damage whenever a major institution fell—no lender of last resort that could allow sound banks with good but temporarily illiquid assets to access cash, no elastic currency that could expand to meet demand, and no mechanism to ensure that small banks issued loans only within their means." *Id.* at 2244. The Panic of 1837—one of the worst financial crises of the nineteenth century—followed almost immediately, a catastrophe "in no small part attributable to Jackson's crusade" against the Second Bank and its independence. *Id.*

In the regulatory vacuum left by the Second Bank's demise, the states moved quickly to fill the gap.[31] Massachusetts, long at the vanguard of banking regulation

[31] Jay B. Sykes, *Federal Preemption in the Dual Banking System: An Overview and Issues for the 116th Congress*, CRS Report No. R45726, at 4 (2019); Kris James

took a leading role.[32] In 1838, Massachusetts established a board of three Bank Commissioners empowered to supervise Commonwealth banks.[33] Commissioners could examine a bank's records, and intervene when its continued operation became "hazardous to the public."[34] Commissioners were understood to exert a "controlling influence" over banks that promoted their "stability and usefulness" and sustained public confidence.[35] Importantly, when the Commonwealth renewed commission-based bank supervision in 1849, it provided that the three commissioners (appointed by the Governor with the advice of a council) could be removed only by the Governor "with the advice of the council."[36] That insulation suited the nature of the office: the Massachusetts Supreme Judicial Court explained that it protected against financial mismanagement and helped preserve the "confidence of the community."[37]

State-led regulatory initiatives soon included credit unions as well. In 1908, Massachusetts Bank Commissioner Pierre Jay urged the legislature to authorize

---

Mitchener & Matthew Jaremski, *The Evolution of Bank Supervision: Evidence from U.S. States* 3, 15 (Nat'l Bureau of Econ. Research, Working Paper No. 20603, 2014).

[32] Mass. Div. of Banks, 2017 Annual Report at 1 (2017); Kris James Mitchener, *supra*, at 11.

[33] Act of Feb. 23, 1838, ch.14, §§2, 5-6.

[34] *Id.* §5; 12 U.S.C. §1756, §1782(a)(1).

[35] Lev Menand, *Why Supervise Banks? The Foundations of the American Monetary Settlement*, 74 Vand. L. Rev. 951, 990-92 & nn.182-83 (2021).

[36] Act of May 2, 1849, ch.217, §4, 1849 Mass. Acts 157, 160.

[37] *Commonwealth v. President of the Farmers & Mechanics Bank*, 21 Pick. 542, 551 (Mass. 1839).

cooperative-credit associations for "people in moderate circumstances" and place them "under the direction of the bank commissioner."[38] The following year, Massachusetts enacted the Nation's first general credit-union statute.[39] The Act defined a credit union as a "cooperative association formed for the purpose of promoting thrift among its members," carrying forward the English tradition.[40]

### B. Federal Statutory Background.

#### 1. Depression-Era Reform and the Federal Credit Union Act.

Congress created the Federal Reserve in 1913 after the Panic of 1907, when a failed attempt by speculators to corner the copper market triggered bank failures and financial contagion forced Congress to confront the absence of an effective central-bank backstop at the federal level. *Cook*, 146 S. Ct. at 2244-45.

Two decades later, the Great Depression produced another wave of institutional reform. Congress restructured the Federal Reserve through the Banking Acts of 1933 and 1935, centralizing greater authority in the Federal Reserve Board and reinforcing its independence, and also creating the FDIC to insure bank deposits

---

[38] U.S. Dep't of Labor, Bureau of Labor Statistics, Bull. No. 314, *Cooperative Credit Societies (Credit Unions) in America and in Foreign Countries* 17 (1922).
[39] Mass. Acts 1909, ch.419; U.S. Dep't of Labor, *supra*, at 39; Nat'l Credit Union Admin., 1999 Annual Report 3 (1999).
[40] U.S. Gen. Accounting Office, *Credit Unions: Reforms for Ensuring Future Soundness*, GAO/GGD-91-85, at 24 (1991); Erdis W. Smith, *supra*, at 3-4.

so as to forestall bank runs and promote the stability of banks and financial markets.[41]

At the same time, Congress enacted the Federal Credit Union Act of 1934, modeling the statute on the Massachusetts Credit Union Act.[42] At the time, traditional lenders shut out working Americans, credit was scarce, and interest rates climbed to the point where individuals of limited means could not borrow.[43] Recognizing that the Nation's "industrial recovery depend[ed] on the buying power" of ordinary citizens, Congress established "a Federal Credit Union System" to "bring normal credit resources on a cooperative basis" to the people.[44]

The Federal Credit Union Act formally brought credit unions chartered under its provisions within a national regulatory framework harking back to the regime Parliament established for friendly societies in the 18th century. Both conditioned formal recognition on governmental approval of the cooperative's governing documents;[45] structured internal governance around member-selected officers

---

[41] *Cook*, 146 S. Ct. at 2245, 2254; Banking Act of 1933, ch.89, §8, 48 Stat. 162, 168; Banking Act of 1935, ch.614, §203, 49 Stat. 684, 704-05.

[42] Pub. L. No. 73-467, 48 Stat. 1216; S. Rep. No. 555, 73d Cong., 2d Sess. 2 (1934).

[43] S. Rep. No. 555, *supra*, at 1, 3; H.R. Rep. No. 2021, 73d Cong., 2d Sess. 1-2 (1934).

[44] S. Rep. No. 555, *supra*, at 1, 3; H.R. Rep. No. 2021, *supra*, at 1-2.

[45] *Compare* 33 Geo. III, c.54, §§1–2 (requiring friendly societies to submit their "rules, orders, and regulations" for governmental review and confirmation), *with* Pub. L. No. 73-467, §§3-4, 8, 48 Stat. at 1217, 1219 (requiring federal credit unions to submit an organization certificate and bylaws for federal approval, with the approved certificate becoming the institution's charter).

responsible for managing the cooperative;[46] protected pooled member funds through bonding requirements;[47] and provided mechanisms for governmental intervention to protect cooperative funds from officer misconduct.[48] As noted above, in England, these functions were all carried out by officials free from control of the Crown, including clerks of the peace.

2. The Creation and Restructuring of the NCUA.

During the decades that followed, federal oversight of credit unions shifted among various agencies.[49] Then, in 1970, Congress created the National Credit Union Administration.[50] The agency was created to place "the credit union supervisory body on a par with the agencies which supervise and regulate banks," like "the Federal Reserve Board."[51]

---

[46] *Compare* 33 Geo. III, c.54, §§4-7, *with* Pub. L. No. 73-467, §11(a)-(b), 48 Stat. at 1219–20.

[47] *Compare* 33 Geo. III, c.54, §4 (providing for officers responsible for society funds to become bound "with two sufficient Sureties" for the "just and faithful Execution" of their trust), *with* Pub. L. No. 73-467, §11(b), 48 Stat. at 1220 (requiring the treasurer to furnish a "bond with good and sufficient surety … conditioned upon the faithful performance of his trust").

[48] *Compare* 33 Geo. III, c.54, §9 (authorizing the Barons of the Exchequer, upon petition by society members alleging trustee misconduct, to appoint counsel to pursue recovery on the society's behalf), *with* Pub. L. No. 73-467, §6, 48 Stat. at 1218 (placing federal credit unions under the Governor's supervision, requiring financial reports, and subjecting their books and records to federal examination).

[49] Exec. Order No. 9148, 7 Fed. Reg. 3145 (Apr. 30, 1942).

[50] Pub. L. No. 91-206, 84 Stat. 49.

[51] 116 Cong. Rec. 2417 (1970).

At its inception in 1970, the NCUA was managed by a single "Administrator," assisted by an advisory board.[52] The advisory board comprised a chair and one member from each of the federal credit union regions, each of whom had to be "persons of tested credit union experience."[53] Under the 1970 statute, the Administrator functioned as the "chief executive officer" of the NCUA.[54] The President appointed the Administrator with the "advice and consent of the Senate," and the Administrator expressly "serve[d] at the pleasure of the President."[55]

The vulnerability inherent in the NCUA's original governance—then vested in a sole Administrator, removable at will—was exposed by President Ford's abrupt removal of its administrator, Herman Nickerson. On the morning of March 10, 1976, Nickerson appeared before the Senate Banking Subcommittee on Financial Institutions to discuss the possible restructuring of the NCUA, where he testified that his "day to day" tenure meant "you don't know whether you're going to take a position that would be your last day in office or not."[56] A few hours later, President Ford summoned Nickerson to the White House and summarily dismissed him.[57]

---

[52] Pub. L. No. 91-206, §3(b), 84 Stat. 49, 50.
[53] *Id.*
[54] *Id.* §3(a), 84 Stat. at 50.
[55] *Id.*
[56] *Restructuring the National Credit Union Administration: Hearing on S. 1475 Before the Subcomm. on Fin. Insts. of the S. Comm. on Banking, Hous. & Urb. Affs.*, 94th Cong. 10 (1976) (statement of Herman Nickerson, Jr.).
[57] Claudia Levy, *Nickerson Successor Expected in Few Weeks, White House Says*, Wash. Post (Mar. 13, 1976), at A14.

That removal led Congress to adopt the NCUA structure in effect today. As explained by the Senator who chaired the committee where Nickerson testified, in introducing the bill that Congress later enacted, "the principal thrust of [his proposed] amendment [to the NCUA enabling law] is to transfer management of the [NCUA] from a single Administrator who serves at the pleasure of the President to a three-member board with fixed terms of office." *Swan v. Clinton*, 100 F.3d 973, 982 (D.C. Cir. 1996) (quoting 123 Cong. Rec. 27,396 (1977)).

In keeping with that stated purpose, the Senate Report for a bill that was an identical predecessor to the Financial Institutions Regulatory and Interest Rate Control Act of 1978,[58] explained that, under the prior regime, "[t]he Administrator of the [NCUA] [wa]s the only Federal financial regulator to serve at the pleasure of the President without tenure."[59] The Committee then explained why it was necessary to change that structure and to align the NCUA with its cousins:

> The lack of tenure [at the NCUA] tends to politicize the day-to-day decisionmaking process and raises the specter of not knowing whether taking a particular controversial position on a controversial issue might cost the Administrator his job.
>
> Ironically, the difficulties encountered by a nontenured Administrator were dramatically emphasized on the very day the Subcommittee on Financial Institutions held the hearing on [NCUA] restructuring. At the hearing, the Administrator himself acknowledged the difficulties inherent in serving without tenure.... Within hours after his appearance before the

[58] Pub. L. No. 95-630, 92 Stat. 3641.
[59] S. Rep. No. 751, 94th Cong., 2d Sess. 3-4 (1976).

> subcommittee, the Administrator was summoned to the White House and dismissed.
>
> At the very least, therefore, the committee recognizes the need to provide tenure for the Administrator in order to strengthen the [NCUA]'s status as an independent agency.[60]

In line with these observations, Congress eliminated the single Administrator and advisory board in 1978 and created today's three-member NCUA Board.[61] In doing so, Congress sought to further align the NCUA's governing structure with "[o]ther financial institutions regulatory agencies and other independent agencies" such as "the Federal Reserve System" and "the FDIC." *Swan*, 100 F.3d at 982.

Under the 1978 statute (which remains the NCUA's organic statue), the President appoints each member, by and with the advice and consent of the Senate.[62] Each member serves a fixed, staggered six-year term, meaning that the term of one member would expire every two years.[63] Moreover, no more than two members can belong to the same political party.[64] The President designates one of them as Chair.[65] And all members must be "broadly representative of the public interest" and must

---

[60] *Id.*
[61] 12 U.S.C. §1752a.
[62] *Id.* §1752a(b)(1).
[63] *Id.* §1752a(c).
[64] *Id.* §1752a(b)(1).
[65] *Id.*

have experience "relating to a broad range of financial services, financial services regulation, or financial policy."[66]

In a marked departure from the prior statute, which expressly provided that the Administrator and the Chair of the advisory board "serve[d] at the pleasure of the President,"[67] Congress eliminated that prescription.

Congress did not include an explicit provision limiting removal, in line with Congress's expressed view that it was unnecessary. Indeed, just one year before, the same Congress that passed the 1978 statute considered—and rejected—adding such a provision to the statute governing the International Trade Commission. The relevant House bill proposed that "any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office."[68] But the conference committee excised it as "unnecessary because the Commission is an independent agency with quasi-legislative and quasi-judicial responsibilities and removal of the Commissioners is subject to the standards set down by the Supreme Court (*e.g., Humphrey's Executor v. United States*, 295 U.S. 602 (1935), *Wiener v. United States*, 357 U.S. 349 (1958))."[69]

---

[66] *Id.* §1752a(b).
[67] Pub. L. No. 91-206, *supra*, at §3(a), 84 Stat. at 50.
[68] H.R. Rep. No. 95-217, at 7 (1977).
[69] *Id.* at 6.

### C. The NCUA Functions as a Central Bank for Credit Unions.

Today, the NCUA serves for credit unions much the same role the Federal Reserve serves for banks, combining supervision, interest-rate setting, and liquidity support within a single independent agency designed to safeguard the stability of the credit-union system—and financial markets. The Board administers these functions through tools funded entirely by the credit unions—not by congressional appropriations—also mirroring the Federal Reserve (and its self-funded structure).[70]

The NCUA Board charters federal credit unions and, like the Federal Reserve does for the banks it supervises, examines them for safety and soundness and enforces capital and lending requirements,[71] sets the maximum interest rate on federal credit union loans,[72] and may act as conservator or liquidating agent when a credit union fails[73]—ensuring the stability of the financial institutions on which over 140 million Americans depend for their savings-and-loan needs.

The Board oversees the Central Liquidity Facility, a "mixed-ownership" Government corporation Congress created to "improve general financial stability by

[70] 12 U.S.C. §1755; *cf. id.* §§243, 244.
[71] *Id.* §§1756, 1782(a)(1) (NCUA); *cf. id.* §§325, 483, 1818(b)(1), 1831p-1(a)(1)(B)-(C), 3907(a)-(b) (Federal Reserve).
[72] *Id.* §1757(5)(A)(vi) (NCUA); *cf. id.* §357 (Federal Reserve).
[73] *Id.* §§1786(h), 1787(a)(1), (b)(2)(A)-(B) (NCUA); *cf. id.* §1821(c)(2)-(3), (d)(1) (FDIC, appointed as conservator or receiver by the appropriate Federal banking agency upon a bank's failure); *id.* §1813(q)(3) (Fed Board of Governors as "appropriate Federal banking agency" for state member banks).

meeting the liquidity needs of credit unions."[74] Congress created the CLF because, while commercial banks could turn to "the Federal Reserve and its discount window" during liquidity crises, credit unions lacked any comparable backstop; the CLF filled that gap to act as "a central bank to the credit union movement."[75]

The Board also administers the National Credit Union Share Insurance Fund, the credit-union counterpart to the FDIC's Deposit Insurance Fund, which itself insures deposits at banks, including banks that are part of the Federal Reserve system, in order to prevent bank runs and promote market stability.[76] The National Credit Union Share Insurance Fund insures member deposits at credit unions, and is capitalized by credit unions, serving the same market-stability purposes.[77]

### D. The President Fires Plaintiffs Without Cause.

Plaintiff Todd M. Harper was first nominated by President Trump to the NCUA Board, and confirmed on March 14, 2019. JA18. President Biden designated Mr. Harper as NCUA Chairman in January 2021 and later renominated him for a

---

[74] *Id.* §1795; *see also* 31 U.S.C. §9101(2)(F).

[75] S. Rep. No. 95-1273, at 5 (1978); *Community Credit Needs: Hearings Before the Subcomm. on Fin. Insts. Supervision, Regul. & Ins. of the H. Comm. on Banking*, Fin. & Urb. Affs., 95th Cong. 385 (1978); 124 Cong. Rec. 38,842 (1978).

[76] 12 U.S.C. §§1781-1790e; *cf. id.* §§1813(c)-(d), 1821(a) (FDIC); *see also id.* §222 (providing that every national bank must become a Federal Reserve member bank and "shall thereupon be an insured bank" under the Federal Deposit Insurance Act).

[77] *Id.* §1782(c)(1)-(2).

full six-year term, which the Senate confirmed on June 8, 2022. JA18. Mr. Harper's term runs through April 10, 2027. JA18.

Plaintiff Tanya F. Otsuka was nominated by President Biden in September 2023 and confirmed by the Senate on December 20, 2023. JA24. Her term runs through August 2, 2029. JA24.

On April 15, 2025, Trent Morse, Deputy Assistant to the President and Deputy Director of the White House Presidential Personnel Office, sent Mr. Harper a one-sentence email stating: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the National Credit Union Administration is terminated, effective immediately." JA6; JA15 ¶11. One minute later, Morse sent Otsuka the same message. JA6; JA15 ¶12. The Government conceded that the President did not assert cause for either removal. JA82.

**E. The District Court Enters Permanent Relief for Plaintiffs.**

On April 28, 2025, Mr. Harper and Ms. Otsuka filed this action challenging their removals. On cross-motions for summary judgment, the district court granted Plaintiffs' motion, denied the Government's, and entered declaratory and permanent relief ordering their reinstatement. JA36; JA77-105.

The district court first held that Congress protected NCUA Board members against at-will removal. Drawing on this Court's decision in *Swan v. Clinton*, the court considered the statute's text and history together with the Board's structure

and functions. JA81-90. The district court emphasized that Congress replaced the single Administrator who expressly served "at the pleasure of the President" with a bipartisan, three-member board serving fixed, staggered six-year terms—deliberately deleting the statutory at-pleasure provision. JA83-84. The NCUA board's multimember structure, expertise requirements, and responsibilities reinforced the same conclusion. JA85-88.

The district court then held that the NCUA's removal protection was constitutional. JA90-95. The district court emphasized that the NCUA "functions much like the Federal Reserve and Federal Deposit Insurance Corporation ('FDIC'), except for credit unions rather than banks." JA77. And it concluded that the Government had identified no relevant difference between the executive power exercised by the NCUA and the Federal Reserve; rather, the agencies' overlapping powers and roles supported the NCUA's constitutionality. JA93-95.

Finally, the district court rejected the Government's contention that reinstatement was unavailable. Relying on this Court's precedent, including *Swan*, the court concluded that it could order Plaintiffs' *de facto* reinstatement by enjoining subordinate executive branch officials. JA97-99. The court thus entered an injunction against treating Plaintiffs as removed, interfering with the performance of their duties, or denying them access to necessary facilities and resources. JA102-05.

The Government noticed an appeal the same day. JA106. The district court denied a stay pending appeal on July 24, 2025, reiterating that the NCUA's predominant role is supervising financial institutions in a manner analogous to the Federal Reserve and FDIC, rather than exercising the sort of substantial executive authority implicated in other removal cases. JA108. On August 21, 2025, after granting an administrative stay, this Court granted a stay pending appeal and expedited the appeal. Order, Doc. No. 2131293 (Aug. 21, 2025).

The Government filed its opening brief on September 12, 2025. On September 29, this Court, on its own motion, removed this case from the oral-argument calendar and held it in abeyance pending the Supreme Court's resolution of *Trump v. Slaughter*. Order, Doc. No. 2137603 (Sept. 29, 2025). Following the Supreme Court's decision in *Slaughter*, this Court returned the case to the active docket on August 5, 2026. The Government then decided to stand on its opening brief.

## SUMMARY OF THE ARGUMENT

**I.** The NCUA organic statute prohibits at-will removal of members of the NCUA Board. Congress restructured the NCUA in 1978 with the explicit purpose of converting the agency, which was then headed by a single Administrator removable at will, into one that was insulated from Presidential removal powers, like the Federal Reserve and the FDIC. Congress's adoption of the regulatory structure endorsed in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), its

provision of fixed terms for Board members, and its explicit removal of any Presidential removal authority all unmistakably indicate that Congress protected Board members from at-will removal. The Government's argument otherwise—that the statute cannot be read to prohibit at-will removal because Congress did not use those exact words—is wrong and inconsistent with *Cook*.

**II.** Congress's protection for NCUA Board members is constitutionally sound. As the Supreme Court recognized in *Cook* and *Slaughter*, a historical tradition limiting Executive authority over financial-institution regulators carries significant constitutional weight. The NCUA exercises statutory authorities for credit unions parallel to those the Federal Reserve exercises for banks, and it was explicitly modeled after the Federal Reserve—which, as the Supreme Court has explained, followed in the tradition of the First and Second Banks of the United States. All the NCUA's enforcement authorities that the Government contests are also wielded by the Federal Reserve Board, confirming the constitutionality of the NCUA's insulation from Presidential removal; and indeed the NCUA has less authority, given that it cannot go to court to enforce its rules and orders. And, following the Supreme Court's practice, to the extent any NCUA Board authority raises constitutional concerns, this Court should simply excise that authority.

**III.** The district court had authority to issue an injunction reinstating Plaintiffs to their offices, as multiple decisions of this Court and the Supreme Court make

clear. *Cook* itself affirmed a preliminary injunction reinstating a Federal Reserve governor during the pendency of the litigation, making the district court's permanent injunction even more clearly permissible. Even if an injunction were unavailable, the district court's order can readily be construed as a writ of mandamus instead.

## ARGUMENT

### I. Plaintiffs' Removal Violates the NCUA Organic Statute.

The district court correctly held that "the text and history of the NCUA statute, along with the structure and function of the NCUA Board, confirm Congress restricted the President's power to remove Board members." JA90. The Supreme Court's decision in *Cook* reaffirmed the core premise of the district court's holding—that Congress was legislating against a settled background rule that provided for-cause removal protections for officers that served fixed terms of office, and that Congress insulated NCUA Board members from at-will removal in 1978.

#### A. The Statute Gives For-Cause Protection.

Whether Congress gave NCUA Board members protection from removal at the President's will is a question of statutory construction turning on the usual rules of interpretation. *Severino v. Biden*, 71 F.4th 1038, 1044 n.2 (D.C. Cir. 2023). As this Court has explained, Congress can provide removal protection in two ways: "First, Congress may impose a removal restriction in the plain text of the statute. Second, Congress may clearly indicate its intent to restrict removals through the statutory structure and function of an office." *Id.* at 1044. Ultimately, the question is

whether "Congress may fairly be said to have conferred" a "power of removal." *Wiener v. United States*, 357 U.S. 349, 353 (1958).

This Court had occasion to consider whether the NCUA statute provides removal protections in *Swan*, albeit in dictum, and concluded that there were several important signs that Congress did so. 100 F.3d at 981-83. As this Court observed, "the strongest reason for according Board members any removal protection, in the absence of any express provision for it in the NCUA statute, is that Congress specifically amended the statute to create the Board and give its members fixed terms of office." *Id.* at 983. Judge Silberman, concurring, saw it the same way, noting that "the most obvious purpose" of the structural amendment adopted by Congress in 1978 was "to provide the [Board] with some measure of tenure or security against arbitrary removal." *Id.* at 990 (Silberman, J., concurring).

The Court should now hold that the NCUA's organic statute does insulate Board members from removal. Congress restructured the NCUA in 1978, placing the agency under the control of a bipartisan Board whose members serve fixed, staggered, six-year terms—thus mirroring the structure of independent agencies that the Supreme Court endorsed in *Humphreys'*. Moreover, Congress "deleted all reference to the President's removal powers" over NCUA leadership. *Swan*, 100 F.3d at 982; *compare* Pub. L. No. 91-206 § 3(b), 84 Stat. 49, 50 *with* 12 U.S.C. §1752a(c). Congress plainly did all this to protect Board members from removal and

align the NCUA with other expert financial-institution regulators like the Federal Reserve and the FDIC, whose governors are not removable at will. 123 Cong. Rec. 27,396 (1977); H.R. Rep. 95-1383, 95th Cong., 2d Sess. 26 (1978).

**1.** This Court recognized in *Severino* that, for statutory-interpretation purposes, the "presumption of removability d[oes] not apply" to multi-member boards of the kind considered in *Humphrey's*. *Severino*, 71 F.4th at 1047. The Supreme Court has since overturned *Humphrey's*, but the same rules of construction remain for purposes of interpreting an organic statute adopted in 1978—when *Humphrey's* was good law—because this Court's "evaluation of congressional action in 197[8] must take into account its [then-]contemporary legal context." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 379 (1982). The Supreme Court affirmed this point in the removal context, holding that its precedents from the time of a statutory enactment "establish[] the baseline against which Congress legislated," and courts should "construe [Congress's] work accordingly," against that backdrop. *Cook*, 146 S. Ct. at 2252.

Consider, for example, *Ysleta del Sur Pueblo v. Texas*, 596 U.S. 685 (2022). There, the Court interpreted a statute providing that some Texas state laws would regulate gaming on tribal reservations. *Id.* at 695-96. The statute did not import every Texas law; it drew a "dichotomy between prohibition and regulation," importing state laws that did the former but not the latter. *Id.* at 696. The Supreme Court had

drawn the same dichotomy six months earlier in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). *Ysleta*, 596 U.S. at 700. As the Supreme Court explained, the "implication" that was "almost impossible to ignore" from the statute's use of the "same prohibitory/regulatory framework" as *Cabazon* was that "Congress drew from *Cabazon*" when drafting its statute. *Id.* at 697. This was because the "Court generally assumes that, when Congress enacts statutes, it is aware of this Court's relevant precedents," and "at the time Congress adopted the [statute], *Cabazon* was not only *a* relevant precedent concerning Indian gaming; it was *the* precedent." *Id.* at 700-01. This "important contextual clue[]" from the time of the statute's enactment "resolve[d]" any questions regarding "the ordinary meaning of the statutory terms before" the Court. *Id*. The same is true here; *Humphrey's* was, in 1978, "not only *a* relevant precedent concerning [for-cause removal]; it was *the* precedent," *id.*, and it is impossible to ignore in interpreting Congress's mandate.

And it is also clear that Congress mimicked the independent agency structure endorsed in *Humphrey's* when it restructured the NCUA Board in 1978, thus showing that Congress insulated NCUA Board members from removal. *Humphrey's* concerned an independent multimember expert board of persons with staggered fixed terms. Congress looked to that tradition in creating the NCUA Board, thus making clear that its members would be protected from removal. JA85-89 (stating that "Congress reconstituted the NCUA Board to share the structural characteristics

from *Humphrey's*" and describing the Board's structure and authorities). Indeed, as noted above, the Congress that enacted the 1978 amendments made clear that it believed express removal protections were unnecessary given the Supreme Court's jurisprudence in *Humphreys'* and *Wiener*. *See supra* at 18.

In creating the Board, Congress was legislating against another backdrop: one that read statutes that gave fixed terms to federal officials as also providing them for-cause removal protections. Thus, the Supreme Court held as far back as 1901 "that where causes of removal are specified by Constitution or statute, *as also where the term of office is for a fixed period*, notice and hearing are essential" before removal, because, if "there were not, the appointing power could remove at pleasure or for such cause as it deemed sufficient." *Reagan v. United States*, 182 U.S. 419, 425 (1901); *see also Shurtleff v. United States*, 189 U.S. 311, 314 (1903). As the Supreme Court held in *Cook*, "*Reagan* and *Shurtleff* established the baseline against which Congress legislated, and we must construe its work accordingly." 146 S. Ct. at 2252. Under those decisions (and *Cook*), "statutes, like the one at issue here, that promise officeholders a term of years" plainly incorporate procedural protections around removal of federal officers, "a default rule" the Supreme Court's "precedent had already made clear." *Cook*, 146 S. Ct. at 2252-53.

**2.** The statutory context against which Congress legislated further confirms this interpretation. That context, which includes a "record of *enacted* changes

Congress made to the relevant statutory text over time," constitutes "the sort of textual evidence everyone agrees can sometimes shed light on meaning." *BNSF Ry. Co. v. Loos*, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting). And here, the statutory context points in the same direction.

As noted, until 1978 the NCUA was managed by one Administrator, who acted as the "chief executive officer" of the agency and "serve[d] at the pleasure of the President," with the assistance of an advisory board. Pub. L. No. 91-206 § 3(b), 84 Stat. 49, 50 (1970). While Congress was considering amending the statute to restructure the NCUA, the President summarily removed the Administrator "[w]ithin hours after his appearance before [a Senate] committee." *Swan*, 100 F.3d at 982. In response, Congress fundamentally restructured the agency, eliminating the Administrator and advisory board and creating a three-member Board serving staggered six-year terms. 12 U.S.C. §1752a; H.R. Rep. No. 95-1383, *supra*, at 26.

At the time, the Senate Banking Committee's report emphasized "the need to provide tenure for the Administrator to strengthen the NCUA's status as an independent agency." *Swan*, 100 F.3d at 982. The report recognized that the NCUA Administrator was "the only Federal financial regulator to serve at the pleasure of the President without tenure," and the "lack of tenure tends to politicize the day-to-day decisionmaking process and raises the specter of not knowing whether taking a

particular controversial position on a controversial issue might cost the Administrator his job." *Id.*[78]

As this Court explained in *Swan*, it is "apparent" from this legislative record "that the Senate Banking Committee believed the six year terms would protect NCUA Board members from at will removal during their appointed terms." 100 F.3d at 982. In order to accomplish that purpose, Congress created the NCUA Board.

As the Government would have it, Congress accomplished exactly nothing by overhauling the NCUA structure. That cannot be. *Fischer v. United States*, 603 U.S. 480, 491-92 (2024) (interpreting statutory text "in light of the history of the provision" and rejecting reading that would ignore the problem Congress sought to address through amendment); *Gundy v. United States*, 588 U.S. 128, 140-41 (2019) (statutory interpretation is a "'holistic endeavor' which determines meaning by looking … to text in context, along with purpose and history").

**3.** But Congress did more than change the NCUA structure: it "deleted all reference to the President's removal powers." *Swan*, 100 F.3d at 982. That history, which is "quite separate from legislative history," reflects the type of "*statutory* history" that "form[s] part of the context" that must be considered in interpreting

---

[78] Consistent with the background principle that establishing a fixed term of office would necessarily provide for-cause removal protections, *supra* at 29, the legislative record consistently refers to "tenure" in distinction to "serv[ing] at the pleasure of the President." S. Rep. No. 94-751, 94th Cong., 2d Sess. 3-4 (1976).

Congress's enactment. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 256 (2012) (emphasis in original).

"When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995); *see Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C. Cir. 1988) ("Where the words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning."). That principle applies equally to the deletion of words: "[w]hen a statutory provision is deleted in a subsequent reenactment, the omitted term cannot be read into the later statute." *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 270, 276 (D.C. Cir. 1988).

There is therefore no way to read the 1978 NCUA organic statute as providing for at-will removal of Board members: Congress explicitly foreclosed this result.

**4.** Reading the statute to provide removal protection for Board members also follows from the structural constraints Congress adopted. Congress's creation of a multi-member agency with members serving staggered, six-year terms would be pointless if the President could remove them without cause. "[S]taggered terms promote 'the independence, autonomy, and non-partisan nature of an agency,'" *Severino*, 71 F.4th at 1049 (quoting *United States v. Wilson*, 290 F.3d 347, 359 (D.C. Cir. 2002)), and show Congress's opposition to permitting a "complete change in

leadership at any one time," *Seila Law LLC v. CFPB*, 591 U.S. 197, 216 (2020). Without protections, the President could remove and reappoint a new NCUA Board at any time, regardless of tenure, making the staggered structure meaningless. *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419-20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

**B. The Government's Arguments Fail.**

The Government ignores nearly all of this, arguing only that "Congress did not enact any statutory restrictions on the President's removal authority" because it did not use the same words it has used to do so in other statutes. Gov't Br. 9-11. But the fact that Congress did not explicitly provide for-cause removal protections in the NCUA organic statute is not dispositive, just as it is not dispositive in the case of the Chair of the Federal Reserve Board (who is not protected by an express provision addressing removal). And in the NCUA's case, although it is true enough that "in the face of congressional silence, the power of removal is incident to the power of appointment," *id.* at 11 (quoting *Kalaris v. Donovan*, 697 F.2d 376, 401 (D.C. Cir. 1983)), as explained above, this is not a case of "congressional silence."

Nor can the Government's argument survive the Supreme Court's decision in *Cook*. There, the Government asserted that Federal Reserve's organic statute did not create notice-and-hearing requirements for removal, even though other laws had such requirements, because "Congress knows how to impose [such] requirements—

that is, expressly—and did not do so." 146 S. Ct. at 2252. The Court rejected this argument, explaining that "[i]t is hardly atextual" to "read text in context, or to examine how this Court interpreted such language at the time of the statute's enactment. If anything, it would be atextual to do otherwise" and then concluding the legal context from "the time of the statute's enactment" meant such protections were "implicitly incorporated" within the statute. *Id.* Much the same is true here, and the fact "[t]hat Congress acted 'out of an abundance of caution' in other statutes" when expressing for-cause removal protections "hardly permits [courts] to ignore" Congress's application of "default rule[s]" the Supreme Court's "precedent had already made clear." *Id.* at 2253.

* * *

In sum, Congress's creation of a multimember agency modeled after *Humphrey's*, with members serving fixed, staggered terms of six years, the deletion of any provision stating that NCUA leadership served at the pleasure of the President, and a legislative context showing that Congress did not want the NCUA to be the sole financial-institution regulator subject to Presidential control, confirm that Congress statutorily protected NCUA Board members from at-will removal.

## II. The NCUA Board's Removal Protections are Constitutional.

Next, Congress's decision to provide removal protections to NCUA Board members is constitutional, and falls squarely within the same historical tradition that

supports the constitutionality of the Federal Reserve's independence. Congress deliberately modeled the NCUA on the Federal Reserve, and the two serve similar functions as lenders of last resort and market stabilizers (the NCUA for credit unions and the Federal Reserve for banks); the cooperative financial institutions the NCUA supervises trace their lineage to institutions overseen by Crown officials insulated from removal, *see supra* at 4-7; and Congress structured the NCUA itself to be "immune from political influence" so that it could "successfully fulfill" its responsibilities. *Swan*, 100 F.3d at 983. Together, those converging features—a shared historical pedigree with the Federal Reserve and substantial functional equivalence to it—place the NCUA within the same tradition and make its independence constitutional. Both serve key roles in safeguarding the financial institutions on which our Nation's consumers rely—140 million of them in the case of credit unions—all in order to promote the security of financial institutions and market stability, just the purpose that animated Parliament more than 400 years ago to insulate such superintendents.

### A. The NCUA Shares the Federal Reserve's Historical Pedigree, Institutional Design, and Market-Stabilizing Function.

**1.** In *Slaughter*, the Supreme Court overturned *Humphrey's Executor* and held that officials within the President's "general administrative control" must generally be removable at his will. 146 S. Ct. at 2305-06. But the Court recognized a historically grounded qualification, and left "open the possibility that some functions

traditionally handled outside the Executive Branch may not be encompassed by" it. *Id.* The Court identified the Federal Reserve as an example of such an entity, given that it "follows in the distinct historical tradition of the First and Second Banks of the United States." *Id.* (citing *Seila Law*, 591 U.S. at 222 n.8).

*Cook*, decided the same day as *Slaughter*, expressly held that Congress could provide removal protection for the Federal Reserve. Looking to the First and Second Banks, the Supreme Court explained that their independence from presidential control enabled them to serve as the "great regulating wheel of the early American financial system" and then concluded that "[t]he Federal Reserve follows in this lineage." *Cook*, 146 S. Ct. at 2254. Notably, the Court did not require the Federal Reserve to mirror its historical predecessors. Rather, the Court emphasized that Congress's powers are not "trapped in amber," and what matters is whether a modern institution formally remains "consistent with the principles that underpin" its historical antecedents. *Id.*

**2.** The NCUA's independence, like the Federal Reserve's independence, falls squarely on the side of constitutionality. First, Congress deliberately modeled the NCUA Board on the Federal Reserve. Congress placed credit-union supervision "on a par with the agencies which supervise and regulate banks," 116 Cong. Rec. 2417 (1970), and later restructured the NCUA with "the Federal Reserve System" as its institutional model. *Swan*, 100 F.3d at 982; *see supra* at 14-18. As the district court

recognized, the NCUA Board is "an independent agency that functions much like the Federal Reserve," serving as "the lender of last resort for, regulat[ing], and … issu[ing] penalties to credit unions"—similar to the Fed "not just in function but in form, too." JA77. If the Federal Reserve follows in this lineage of independent financial institutions whose for-cause removal protections have "long coexisted with Article II," *Cook*, 146 S. Ct. at 2257 (Kavanaugh, J., concurring), then so does the NCUA Board.

Second, the modern NCUA also traces its origin of independence to the English tradition of insulating those with oversight over friendly societies. The predecessors of modern credit unions, friendly societies, were supervised by Crown officials removable only for cause, *see supra* at 4-9, and the American credit-union regime emerged from a Massachusetts tradition of insulated financial supervision in which, after the Second Bank's demise, public banking supervisors assumed regulatory functions the Bank had previously performed, *see supra* at 10-12.

These two strands converge on the same constitutional principle recognized in *Cook*: Article II accommodates the Federal Reserve, and it accommodates an independent NCUA Board. *Cook*, 146 S. Ct. at 2254; *Swan*, 100 F.3d at 983-84.

**3.** The NCUA's functions also confirm its constitutionality, as these closely parallel the market-stabilizing functions of the Federal Reserve that *Cook* highlighted. Most notably, just like the Federal Reserve, the NCUA serves as credit

unions' lender of last resort, through the Central Liquidity Facility, which Congress created "to improve general financial stability by meeting the liquidity needs of credit unions," 12 U.S.C. §§1795-1795k, just as "the Federal Reserve discount window provides access to loans for its eligible depository institutions," *Frequently Asked Questions and Glossary*, Nat'l Credit Union Admin., https://ncua.gov/support-services/central-liquidity-facility/frequently-asked-questions-and-glossary.

Beyond its lender-of-last-resort function, the NCUA also addresses credit-union failure and insures member accounts (preventing bank runs) via the National Credit Union Share Insurance Fund—the credit-union counterpart to the FDIC. *Swan*, 100 F.3d at 975. The NCUA Board examines credit unions for financial soundness and enforces capital and safe-and-sound lending requirements—just like the Fed—thus providing a central-banking "mechanism to ensure that small banks issue[] loans only within their means." *Cook*, 146 S. Ct. at 2244; 12 U.S.C. §§1756, 1782(a)(1). When a credit union fails, the NCUA may act as conservator or liquidating agent to preserve assets and protect members, thus acting like a central bank to "contain the damage whenever a major institution" falls. *Cook*, 146 S. Ct. at 2244; 12 U.S.C. §§1786(h), 1787(a)(1), (b)(2)(A)-(B). And near the Republic's founding, officials free from Crown meddling performed much the same functions in overseeing friendly societies. *See supra* at 4-7.

The NCUA also sets the maximum interest rate on federal-credit-union loans in consultation with federal financial-institution regulators, including the Federal Reserve Board, performing a rate-setting function analogous to the Federal Reserve's own role in setting lending rates. 12 U.S.C. §1757(5)(A)(vi); *id.* §357.

In short, Congress gave the NCUA the very market-stabilizing functions with regard to *credit unions*—lender-of-last-resort lending, deposit insurance, safety-and-soundness supervision, conservatorship, and interest-rate setting—that *Cook* traced through the Nation's central-bank tradition for *banks*. 146 S. Ct. at 2244.

**4.** Also of note, Congress paired the market-stabilizing functions that it assigned to the NCUA with an institutional design that, like the Federal Reserve's, places the NCUA's operations at a "deliberate remove from the ordinary political process." *Cook*, 146 S. Ct. at 2254. The NCUA "sets its own budget, free of congressional control," *id.*, through fees imposed on the credit unions it regulates. *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 467 (2024) (Alito, J., dissenting) (noting similarity to the Fed); 12 U.S.C. §1755. And the NCUA also possesses structural features analogous to the "quasi-private" characteristics the Supreme Court previously found salient in the Federal Reserve. *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). The NCUA's Share Insurance Fund is capitalized by credit unions themselves, 12 U.S.C. §1782(c), while the Central Liquidity Facility is a "mixed-ownership Government corporation" owned by its member credit unions

and managed by the NCUA Board, 31 U.S.C. §9101(2)(F); 12 U.S.C. §§1795-1795k. Taken together, these features place NCUA's market-stabilizing responsibilities at the same political remove that the Supreme Court identified as a hallmark of the Federal Reserve's independence. *Cook*, 146 S. Ct. at 2254.

### B. The NCUA's Enforcement Powers Confirm Rather Than Undermine the Constitutionality of its Independence.

All but ignoring this (and not mentioning the Fed), the Government contends that the NCUA Board "wields significant executive authority," pointing to its ability to initiate enforcement proceedings, issue cease-and-desist orders, order civil penalties, remove credit-union officers, and promulgate "substantive rules that bind regulated credit unions." Gov't Br. 23-24. The Government also invokes the judicial enforcement of NCUA orders, arguing that the "discretionary power to seek judicial relief" is "necessarily executive." *Id.* That argument proves far too much. The principal enforcement and adjudicatory powers the Government identifies as supposedly offending Article II were conferred on the NCUA and Federal Reserve Board at the same time, in the same statute, as part of Congress's response to the same financial crisis, and the Supreme Court rejected the same arguments when the Government made it as to the Federal Reserve. *Cook*, 146 S. Ct. at 2254.

Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") in 1989 in response to the savings-and-loan crisis, "the greatest collapse of U.S. financial institutions since the Great Depression." Pub.

L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA"); Timothy Curry & Lynn Shibut, *The Cost of the Savings and Loan Crisis: Truth and Consequences*, 13 FDIC Banking Rev. 26, 33 (Dec. 2000). In FIRREA, Congress simultaneously expanded and harmonized the authority of three agencies—the Federal Reserve, the FDIC, and the NCUA—giving each of these three agencies materially indistinguishable authority to enter cease-and-desist orders, remove or prohibit officers and directors, and impose parallel civil money penalties. FIRREA §§902-905, §907. FIRREA even required the Federal Reserve, the NCUA, and the other federal banking agencies to "jointly … establish their own pool of administrative law judges" and "develop a set of uniform rules and procedures for administrative hearings," mandating not merely parallel authority but a shared adjudicative infrastructure. FIRREA §916.

The result is that the NCUA Board's enforcement powers now targeted by the Government in its brief are also wielded by the Federal Reserve Board; the Federal Reserve exercises every single authority for banks that the Government now says is improper in the hands of the NCUA Board when exercised for credit unions. Like the NCUA Board, the Federal Reserve Board can promulgate regulations governing institutions within its purview,[79] initiate enforcement actions for unsafe or unsound

[79] 12 U.S.C. §§248(i), 1844(b) (Federal Reserve) (authorizing promulgation of binding rules and regulations); *id.* §§1766(a), 1789(a)(11) (NCUA) (same).

practices,[80] issue cease-and-desist orders,[81] remove financial-institution officers and directors,[82] and impose daily civil penalties up to $1,000,000.[83] With this overlap in enforcement powers, "[i]f the NCUA Board exercises substantial executive power, it is difficult to see how the same would not be true of the Federal Reserve." JA94.

Moreover, the fact that Congress chose to confer these powers simultaneously to all three agencies is itself constitutionally significant. History, the Supreme Court explained in *Cook*, does not leave the Nation's financial regulators "trapped in amber." 146 S. Ct. at 2254 (quoting *United States v. Rahimi*, 602 U.S. 680, 691 (2024)). Modern powers do not sever an institution from its historical lineage merely because its predecessors lacked them; what matters is whether the modern institution remains "consistent with the principles that underpin" that tradition. *Id.* That is so for the Federal Reserve "as currently structured and with its existing enforcement authorities." *Id.* at 2254 n.6. And, given that the NCUA has the same authorities under the same statute, based on the same historical tradition, with the only

[80] *Id.* §§1813(q)(3), 1818(b)(1) (Federal Reserve) (authorizing enforcement proceedings for unsafe or unsound practices); *id.* §1786(e)(1) (NCUA) (same).
[81] *Id.* §1818(b)(1), (i)(1) (Federal Reserve) (authorizing issuance of cease-and-desist orders); *id.* §1786(e)(1), (k)(1) (NCUA) (same).
[82] *Id.* §1818(e)(1) (Federal Reserve) (authorizing removal or prohibition of institution-affiliated parties, including officers and directors); *id.* §1786(g)(1) (NCUA) (same).
[83] *Id.* §1818(i)(2) (Federal Reserve) (authorizing civil money penalties of up to $1,000,000 per day for the most serious violations); *id.* §1786(k)(2) (NCUA) (same).

difference being that the Federal Reserve supervises banks while the NCUA supervises credit unions, the NCUA must also be constitutional. "At the end of the day, the Government does not point to any difference at all between the[se] agencies with respect to the relevant executive power analysis." JA94-95.

Finally, it is worth noting that the NCUA has less executive authority than the Federal Reserve. *Slaughter* identified the "discretionary power to seek judicial relief" as lying "at the very core of executive authority." 146 S. Ct. at 2305. The Federal Reserve possesses precisely the same power; it may "act in its own name and through its own attorneys" in courts of law when enforcing the laws and regulations within its purview. 12 U.S.C. §§248(p), 1818(i)(1).

The NCUA, by contrast, "does not have independent litigation authority" and must instead rely on the Department of Justice to enforce compliance. U.S. Dep't of Justice, Office of Legal Policy, Report to Congress on the Use of Administrative Subpoena Authorities by Executive Branch Agencies and Entities, Pursuant to Pub. L. No. 106-544, §7, at 170; *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 588 (2010) (Breyer, J., dissenting) (NCUA lacks "authority to appear in court independent of the Department of Justice"). The NCUA thus cannot invoke the judicial power of the United States against private parties. Only the Attorney General can, and he is directly accountable to and removable at will by the President. Thus, the argument

against for-cause removal protections being unconstitutional is even weaker for the NCUA than it is for the Federal Reserve.

### C. Any Unconstitutional Authority Is Severable.

Even if any elements of the NCUA Board's authority raised constitutional concerns, this Court should sever those elements and maintain the Board's independence. *E.g.*, *United States v. Arthrex, Inc.*, 594 U.S. 1, 23-26 (2021) (with concurrence of Breyer, J., remedying Appointments Clause defect by excising unconstitutional authority of administrative patent judges); *see also Slaughter*, 146 S. Ct. at 2304 n.3 (acknowledging appropriateness of considering severability issue).

"Generally speaking, when confronting a constitutional flaw in a statute, [courts] try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Seila Law*, 591 U.S. at 234. Courts "answer [such a] remedial question by looking to legislative intent," "seek[ing] to determine what 'Congress would have intended' in light of the Court's constitutional holding." *United States v. Booker*, 543 U.S. 220, 246 (2005). The district court did not reach this severability issue because it found no violation, but plaintiffs raised the point below. Dist. Ct. Dkt. 13 at 17-19. The Government does not acknowledge it at all.

Thus, if this Court were to determine, for example, that the NCUA has the authority to prosecute civil lawsuits without DOJ's involvement—an authority the NCUA Board has not interpreted its organic statute to allow and which it has never

wielded (*supra* 43-44)—*and* that this authority is constitutionally problematic, then the Court should sever that authority. The question becomes whether "Congress would have preferred a dependent" NCUA Board, *Seila Law*, 591 U.S. at 236, or an independent Board with more limited powers.

Given Congress's clearly expressed intent to insulate the NCUA Board from presidential supervision, Congress plainly would not have intended that the NCUA retain marginal (or even hypothetical) executive authority at the expense of that independence. *Cf. Bowsher v. Synar*, 478 U.S. 714, 735 (1986) ("[S]triking the removal provisions would lead to a statute that Congress would probably have refused to adopt."). Congress made this preference explicit: FIRREA—which invested the NCUA Board with enforcement and civil penalty authorities—contains a severability clause. Pub. L. No. 101-73, §1221, 103 Stat. 183, 547. The Financial Institutions Regulatory and Interest Rate Control Act of 1978—which established the Board's current structure—does not. Pub. L. No. 95-630, 92 Stat. 3641.

In any case, the Government has done nothing to show that the Court should excise any of the Board's authorities *now*. The Supreme Court's "precedents have long permitted private parties aggrieved by an official's exercise of executive power to challenge the official's authority to wield that power while insulated from removal by the President." *Seila Law*, 591 U.S. at 212. A full test of the Board's authority should await such a case. *Arthrex*, 594 U.S. at 24 (endorsing "partial, rather than

facial, invalidation" of statute); *cf. United States v. Salerno*, 481 U.S. 739, 745 (1987) (fact that statute "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment").

## III. The District Court Properly Ordered Reinstatement of Plaintiffs.

The Government finally argues that the district court lacked the authority to enter any order reinstating Plaintiffs. Gov't Br. 26-31. This is wrong. The Supreme Court in *Cook* rejected the notion that courts are powerless to "grant a preliminary injunction ordering reinstatement [of an improperly removed officer] during the pendency of litigation" and thus affirmed an injunction ordering *preliminary* reinstatement of a federal officer. 146 S. Ct. at 2250-51. Courts surely have authority to enter *final* relief ordering "reinstatement" of an improperly removed officer *after* "the pendency of litigation," whether by way of a permanent injunction or a writ of mandamus. *Id.* After *Cook*, any contrary suggestion is unserious.

### A. The District Court Had Authority to Grant Injunctive Relief Ordering *De Facto* Reinstatement.

It is firmly established in this Circuit that a court "can enjoin 'subordinate executive officials' to reinstate a wrongfully terminated official '*de facto*' even without a formal presidential reappointment." *Severino*, 71 F.4th at 1042-43. This is exactly what the district court ordered. The Government's arguments that "a court

'has no jurisdiction … to enjoin the President in the performance of his official duties,'" Gov't Br. 27 (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867)), are irrelevant—the district court's injunction does not run to the President. JA104. And this Court has squarely rejected its assertion that such an injunction is equally invalid if it runs to "subordinates," Gov't Br. 29-30. *See, e.g.*, *Severino*, 71 F.4th at 1042-43; *Swan*, 100 F.3d at 976-78.

The district court's authority to issue the injunction on appeal is supported by a body of decisions from the Supreme Court making clear that injunctive relief is available to order the reinstatement of federal officials—not just during litigation, as *Cook* established—but also after judgment. *Sampson v. Murray*, 415 U.S. 61, 84, 92 n.68 (1974); *Vitarelli v. Seaton*, 359 U.S. 535, 537, 546 (1959); *Webster v. Doe*, 486 U.S. 592, 604-05 (1988). Vague references to "Article II problems," Gov't Br. 28, do not eliminate the judicial ability to reinstate improperly removed officials. *Elrod v. Burns*, 427 U.S. 347, 352 (1976) (plurality op.) (rejecting view that "the executive's responsibility to insure that the laws be faithfully executed requires the power of appointment or removal at will, unimpaired by any judicial oversight").

The Government argues the Court should ignore its own precedent in *Swan* and *Severino* because those cases concerned the redressability element of standing and did not specifically review "an order like the ones presented here." Gov't Br. 30-31. That makes no sense. Each case necessarily determined that an injunction

was available to redress the unlawful removal of a federal official; without that conclusion, standing (and therefore jurisdiction) would have been lacking. *Swan*, 100 F.3d at 979-80; *Severino*, 71 F.4th at 1042-43; *see also Dellinger v. Bessent*, 2025 WL 559669, at *6 n.1 (D.C. Cir. Feb. 15, 2025) ("[A] court can unquestionably review the legality of the President's action by enjoining the officers who would attempt to enforce the President's order."). Indeed, the Government eventually concedes that under *Severino* and *Swan* a court can "require[] a subordinate officer to allow a plaintiff to exercise some of the privileges of the office," Gov't Br. 30—exactly what the district court did. Nor can that argument survive *Cook*'s holding.

Turning farther afield, the Government attempts to fashion a backpay-only rule from the fact that, in some removal cases, the plaintiffs chose to seek only backpay. Gov't Br. 27-28. That argument again cannot be squared with *Cook*, which rejected the view that a plaintiff could only perhaps seek "backpay later." 146 S. Ct. at 2250. Moreover, the plaintiffs in each of the cases the Government cites sought backpay because it was the only remedy available to them, not because of an unspoken rule prohibiting any other remedy. *See Humphrey's*, 295 U.S. at 618 (plaintiff died); *Myers v. United States*, 272 U.S. 52, 106 (1926) (plaintiff's term ended); *Wiener*, 357 U.S. at 350-51 & n.* (War Claims Commission was abolished).

The Government then turns to the theory that Plaintiffs' remedies are limited to those that would be "traditionally accorded by courts of equity." Gov't Br. 28

(quoting *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). In *Grupo Mexicano*, the Court voided an injunction "that ha[d] never been available before" and was "specifically disclaimed by longstanding judicial precedent." *Id.* at 322. The same is not true here. English courts of equity typically "declined to issue injunctions reinstating officials to their positions," but that was "because the King's Bench, a court of law, would readily issue mandamus instead." *Harris v. Bessent*, 775 F. Supp. 3d 164, 182 (D.D.C. 2025). After the merger of law and equity, that distinction is irrelevant. *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 297 (1943).[84] Arguing otherwise, the Government relies on *Baker v. Carr*, 369 U.S. 186, 231 (1962), which simply recited the holding of *White v. Berry*, 171 U.S. 366 (1898). But "[m]uch water has flowed over the dam since 1898," and later cases "establish that federal courts do have authority to review the claim of a discharged governmental employee." *Sampson*, 415 U.S. at 71-72.

**B. The Equities and Public Interest Favor Plaintiffs.**

The Government also argues that the district court "abused its discretion in granting equitable relief to reinstate plaintiff" by relying on the Supreme Court's stay decisions in *Wilcox*, 145 S. Ct. at 1415 and *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025), and this Court's decision in *Dellinger v. Bessent*, 2025 WL 887518, at

[84] The same is true of declaratory relief, which is available "both at law and in equity." *Great Lakes*, 319 U.S. at 299.

*3 (D.C. Cir. Mar. 10, 2025). These decisions indicate that, at the preliminary relief stage and with respect to at least some federal agencies, "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Wilcox*, 145 S. Ct. at 1415.

But *Cook* makes clear there is no such brightline rule barring even preliminary injunctions, and these decisions surely have no application to the district court's *permanent* injunction, after summary judgment, mandating Plaintiffs' reinstatement. The district court concluded that "Congress's for-cause removal restrictions for NCUA Board members do not pose any constitutional problem" and that Plaintiffs' "removals were unlawful." JA96. The Government thus faces no "risk of harm" at all from an injunction. Where Congress has properly and constitutionally insulated an independent agency from Executive authority, restoration of Plaintiffs to their offices in that agency does not retrench on any Executive authority.

To the contrary, there is "substantial public interest" in "having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). In this case, it serves the public interest by protecting the NCUA's independence, as intended by Congress—this "[i]ndependence from presidential control" matters for "agencies charged with regulating financial institutions, such as the NCUA" because it instills

"greater confidence in financial institutions." *Swan*, 100 F.3d at 983; *see also* Cook, 146 S. Ct. at 2250-51 (upholding preliminary injunction on basis that a contrary result would "significantly interfere with the independence of the Federal Reserve"). The injunction ends the unlawful efforts to paralyze the NCUA by depriving it of a quorum, allowing Plaintiffs to resume their posts and the NCUA to undertake its ordinary functions, including operation of the Central Liquidity Facility.

### C. Even If the Court Lacked Injunctive Power, Plaintiffs Would Be Entitled to the Same Relief at Law.

Even if equitable relief were not available (despite this Court's precedent), Plaintiffs would still be entitled to permanent reinstatement via a writ of mandamus (which Plaintiffs sought below), and the Court could affirm on that alternate basis. Again, *Cook*'s holding that a preliminary injunction is available during litigation makes clear that if a permanent injunction is not later available, then mandamus is. 146 S. Ct. at 2251 ("[A] court of equity would not and could not finally determine whether a plaintiff was validly removed—that was a question only a court of law could settle (again, historically) by *quo warranto* or mandamus.").

The writ of mandamus has been an appropriate remedy to restore an officer wrongfully removed from office "from the earliest days of the Republic." Milton Eisenberg, *The Influence of the Writ of Mandamus in Federal Personnel Litigation*, 45 Geo. L.J. 388, 388 (1957). Before the Founding, courts long could issue "mandamus" as a "full and effectual remedy" "for refusal of admission where a

person is intitled to an office" or "for wrongful removal, when a person is legally possessed" and "the franchise[] concern[s] the public." 3 W. Blackstone, Commentaries on the Laws of England *264-65. Mandamus was "frequently" awarded as a remedy for plaintiffs seeking "restoration to public office," and "listed in treatises as the primary type of case in which a court would grant mandamus." Audrey Davis, Note, *A Return to the Traditional Use of the Writ of Mandamus*, 24 Lewis & Clark L. Rev. 1527, 1540-41 (2020).

Numerous cases in the Supreme Court and this Court therefore make clear that mandamus would be an available and adequate remedy to order reinstatement of a federal official wrongfully removed from office. *In re Sawyer*, 124 U.S. 200, 212 (1888); *White*, 171 U.S. at 377; *Kalbfus v. Siddons*, 42 App. D.C. 310, 319-21 (D.C. Cir. 1914) ("In contemplation of law, the relator has never been out of his office, but as in fact he has been and now is being illegally excluded from it, it is clear that mandamus is the most adequate remedy to restore him to his rights."). Plaintiffs therefore present "a plain case for a mandamus." *Marbury v. Madison*, 5 U.S. 137, 173 (1803).

Amici urge this Court to hold instead that Plaintiffs' sole remedy is the writ of quo warranto established under D.C. Code §16-3501. Brief of Amici 21 States,

Doc. No. 2136331 at 12-23. But Plaintiffs' offices remain vacant,[85] and quo warranto is only available when the office is filled. *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 502 (1933); *Kalbfus*, 42 App. D.C. at 319-20; *People ex rel. Van Voast v. Van Slyck*, 4 Cow. 297, 321 (N.Y. Sup. Ct. 1825) ("The right to interfere with wrongful elections by *mandamus* or *quo warranto* existed at common law …. The former is to compel admission when the office is vacant; the latter to oust when it is improperly filled."). D.C. law indeed provides that quo warranto "may be issued" only against "a person who … usurps, or intrudes into, or unlawfully holds or exercises … a public office of the United States." D.C. Code §16-3501; *see also Sibley v. Obama*, 866 F. Supp. 2d 17, 21 (D.D.C. 2012) ("The statutory authority for the writ also limits its scope to challenges regarding a current officeholder."). As this Court has instructed, "equity will not be barred from issuing an injunction to restrain invalidly appointed officers if the alternative remedy of *quo warranto* is inadequate." *Andrade v. Lauer*, 729 F.2d 1475, 1498 (D.C. Cir. 1984).

In short, to the extent this Court holds that injunctive relief is unavailable, it should construe the district court's order to grant a writ of mandamus, and affirm on

[85] On August 24, 2026, a Chairman of the NCUA Board was appointed. NCUA, "President Trump Designates John Crews as Chairman of the NCUA Board" (Aug. 24, 2026) *available at* https://ncua.gov/newsroom/press-release/2026/president-trump-designates-john-crews-chairman-ncua-board. Plaintiffs' two Board positions remain vacant. *See* NCUA, "Leadership" (last visited Aug. 28, 2026), *available at* https://ncua.gov/about/leadership.

that basis. *Swan*, 100 F.3d at 980 & n.3 (noting authority to amend complaint to afford proper injunctive relief and avoid "elevat[ing] form over substance in a case of this dimension"); *Leopold v. Manger*, 102 F.4th 491, 494 (D.C. Cir. 2024) (construing request for mandamus as "an application for a mandatory injunction").

## CONCLUSION

This Court should affirm.

Dated: August 28, 2026

Respectfully submitted:

*/s/ Vincent Levy*
Vincent Levy
Jack L. Millman
Denis D. Metin
Daniel Fahrenthold
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
Tel.: (646) 837-5151
vlevy@hsgllp.com

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P 27(D)(2)(A)**

I hereby certify that the preceding answering brief complies with the type-volume limitation of the Rules, containing 12,642 words, excluding the parts of the document exempted by Federal Rules of Appellate Procedure 32(f). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

*/s/ Vincent Levy*

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2026, I caused this document to be filed through the ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Vincent Levy*