[NOT YET SCHEDULED FOR ORAL ARGUMENT]

**No. 25-5268**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

TODD M. HARPER,
in his personal capacity and in his official capacity as a Member of the National Credit Union Administration Board, *et al.*,

Plaintiffs-Appellees,

v.

SCOTT BESSENT, in his official capacity as Secretary of the Treasury, *et al.*,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

# REPLY BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
LAURA E. MYRON
DANIEL AGUILAR
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

# TABLE OF CONTENTS

**Page**

GLOSSARY .......... v

SUMMARY OF ARGUMENT .......... 1

ARGUMENT .......... 2

I. NCUA Board Members Are Removable At Will Because Congress Has Not Placed Any Restrictions On The President's Removal Authority .......... 2

II. The NCUA Is Not The Federal Reserve .......... 8

III. The District Court Erred In Ordering Plaintiffs' Reinstatement To Office .......... 13

CONCLUSION .......... 15

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*13th Regional Corp. v. U.S. Department of Interior*,
654 F.2d 758 (D.C. Cir. 1980) ........ 14

*Blanton v. Office of the Comptroller of the Currency*,
909 F.3d 1162 (D.C. Cir. 2018) ........ 9

*Collins v. Yellen*,
594 U.S. 220 (2021) ........ 7, 9

*Ex parte Hennen*,
38 U.S. 230 (1839) ........ 4

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
561 U.S. 477 (2010) ........ 2

*Harris v. Bessent*,
160 F.4th 1235 (D.C. Cir. 2025) ........ 3, 7, 8, 14

*Illinois v. Ferriero*,
60 F.4th 704 (D.C. Cir. 2023) ........ 14, 15

*In re Sawyer*,
124 U.S. 200 (1888) ........ 14

*Kennedy v. Braidwood Management, Inc.*,
606 U.S. 748 (2025) ........ 4, 5

*Myers v. United States*,
272 U.S. 52 (1926) ........ 2

*Novartis Pharmaceuticals Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024) ........ 6

*PHH Corp. v. CFPB*,
881 F.3d 75 (D.C. Cir. 2018) (en banc) ........ 7

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ........ 2, 10, 11, 13

*Shurtleff v. United States*,
189 U.S. 311 (1903) .......... 5

*Trump v. Cook*,
146 S. Ct. 2234 (2026) .......... 1, 6, 8, 9, 11, 12, 13, 14

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) .......... 2, 3, 4, 6, 7, 8, 13

*Trump v. Wilcox*,
145 S. Ct. 1415 (2025) .......... 9

*United States v. Hansen*,
599 U.S. 762 (2023) .......... 8

**Constitution and Statutes:**

U.S. Const. art. II, § 1, cl. 1 .......... 2

Act of Feb. 25, 1791, ch. 10,
1 Stat. 191 .......... 11

Pub. L. No. 63-43,
38 Stat. 251 (1913) .......... 1, 12

5 U.S.C. § 1202(d) .......... 3-4

12 U.S.C. § 242 .......... 1, 6

12 U.S.C. § 1752a .......... 7

12 U.S.C. § 1752a(a) .......... 4

12 U.S.C. § 1752a(b)(1) .......... 4

12 U.S.C. § 1752a(b)(2)(A), .......... 4

12 U.S.C. § 1752a(b)(2)(B) .......... 4

12 U.S.C. § 1752a(c) .......... 4

12 U.S.C. § 1752a(d) .......... 4

12 U.S.C. § 1812 .......... 10

12 U.S.C. § 5491(c)(3) .......... 3

15 U.S.C. § 41 .......... 3

15 U.S.C. § 7217(d)(3) .......... 3

29 U.S.C. § 153(a) .......... 3

42 U.S.C. § 299b-4(a)(6) .......... 5, 6

**Other:**

1 Annals of Cong. (1789) .......... 9

Benjamin Haggott Beckhart, Federal Reserve System (1972) .......... 11, 12

The Federalist (J. Cooke ed. 1961) .......... 4

Roger Lowenstein, America's Bank: The Epic Struggle to Create the Federal Reserve (2015) .......... 11, 12

The Papers of Thomas Jefferson (Julian P. Boyd ed., 1951) .......... 4

Woodrow Wilson, A History of the American People (1902) .......... 11

The Works of Alexander Hamilton (Henry Cabot Lodge ed., 1885) .......... 10

## GLOSSARY

| | |
|---|---|
| CFPB | Consumer Financial Protection Bureau |
| NCUA | National Credit Union Administration |

## SUMMARY OF ARGUMENT

Congress placed no statutory limits on the President's ability to remove members of the National Credit Union Administration Board, and the President can remove those principal officers at will. While plaintiffs try to analogize themselves to the Federal Reserve Board of Governors, that analogy fails on its own terms because Congress explicitly provided for statutory restrictions for the Federal Reserve, 12 U.S.C. § 242, but did not do so for the NCUA. And in all events, the NCUA is not the Federal Reserve, which follows in the unique historical tradition of the First and Second Banks of the United States, *see Trump v. Cook*, 146 S. Ct. 2234, 2251 (2026), to create "a sound national currency" of paper money, *id.* at 2243; *accord* Pub. L. No. 63-43, 38 Stat. 251, 251 (1913) (creating the Federal Reserve "to furnish an elastic currency"). Plaintiffs err in suggesting that Congress can generally insulate financial and banking regulators from presidential control. The district court erred in ordering plaintiffs' reinstatement to executive office, and this Court should reverse.

## ARGUMENT

### I. NCUA Board Members Are Removable At Will Because Congress Has Not Placed Any Restrictions On The President's Removal Authority

"Nearly 250 years ago, the Framers decided to vest '[t]he executive Power' in one person—'a President of the United States of America.'" *Trump v. Slaughter*, 146 S. Ct. 2283, 2291 (2026) (quoting U.S. Const. art. II, § 1, cl. 1). "Because no one could 'execute the laws' 'alone and unaided,'" *id.* (quoting *Myers v. United States*, 272 U.S. 52, 117 (1926)), "the Framers expected that the President would rely on subordinate officers for assistance," *Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020). And to oversee those subordinates, the "Constitution gives the President 'the authority to remove those who assist him in carrying out his duties,'" because without that power of removal "the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Id.* (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 513-14 (2010)).

Plaintiffs were appointed by the President to serve as principal officers of an executive agency, the National Credit Union Administration, and they possessed quintessential executive powers to promulgate binding regulations, to enforce federal law, and to adjudicate violations. Plaintiffs—

like all officers within the Executive Branch—"exercise the *President's* power, not their own, and thus must be *responsible* to him." *Slaughter*, 146 S. Ct. at 2310. Thus, when confronted with officers who exercised materially similar executive power in leading their agencies, this Court held that "Congress may not restrict the President's ability to remove" members of the Merit Systems Protection Board or the National Labor Relations Board. *Harris v. Bessent*, 160 F.4th 1235, 1256 (D.C. Cir. 2025).

Of course, *Slaughter*, *Selia Law*, *Free Enterprise Fund*, and *Harris* all posed a more difficult question than this appeal, because in each of those cases Congress actually imposed a restriction on the ability to remove the executive officers. *See* 15 U.S.C. § 41 (Federal Trade Commissioners "may be removed by the President for inefficiency, neglect of duty, or malfeasance in office"); 12 U.S.C. § 5491(c)(3) ("The President may remove the [Consumer Financial Protection Bureau] Director for inefficiency, neglect of duty, or malfeasance in office"); 15 U.S.C. § 7217(d)(3) (Public Company Accounting Oversight Board members may be "remove[d] from office" for "willfully abus[ing] the authority of that member" or other specified reasons); 29 U.S.C. § 153(a) (President may remove National Labor Relations Board members "for neglect of duty or malfeasance in office, but for no other cause"); 5 U.S.C. § 1202(d) (Merit Systems

Protection Board members "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office").

But there is no statutory removal restriction here. Congress established the NCUA Board, 12 U.S.C. § 1752a(a), provided that its members will be appointed by the President with Senate confirmation, *id.* § 1752a(b)(1), that the President must consider a nominee's experience in finance, *id.* § 1752a(b)(2)(A), that not all three members may be from the same political party, *id.* § 1752a(b)(1), that only one member may have recently served at an insured credit union, *id.* § 1752a(b)(2)(B), that members have overlapping six-years terms of office, *id.* § 1752a(c), and that a majority of members constitutes a quorum, *id.* § 1752a(d). But Congress placed no limits on the usual rule "[h]e who appoints may remove," and that "those who hold offices during pleasure [are] dependent on the pleasure of those who appoint them." *Slaughter*, 146 S. Ct. at 2295 (quoting 4 The Papers of Thomas Jefferson 281 (Julian P. Boyd ed., 1951) and The Federalist No. 66, at 404 (A. Hamilton) (J. Cooke ed. 1961)). And when "no statute restricts removal," "'there can be no doubt' that the" President as the appointing authority may remove NCUA Board Members "at will." *Kennedy v. Braidwood Management, Inc.*, 606 U.S. 748, 764 (2025) (quoting *Ex parte Hennen*, 38 U.S. 230, 259 (1839)).

Plaintiffs resist that straightforward conclusion by—much as the district court did—scouring legislative history, statutes no longer in effect, and the zeitgeist of the 1970s to argue that Congress should be understood to have *implied* removal restrictions for the Board without bothering to have enacted any. Br. 25-34. But the fundamental problem with that approach is that "Congress must use very clear and explicit language" to "take away the power of at-will removal from an appointing officer." *Braidwood*, 606 U.S. at 771 (quotation marks omitted). Thus, "in the absence of [a] constitutional or statutory provision" explicitly to the contrary, the longstanding constitutional rule is that "the President can, by virtue of his general power of appointment, remove an officer, even though appointed by and with the advice and consent of the Senate." *Shurtleff v. United States*, 189 U.S. 311, 314 (1903).

Thus, in *Braidwood*, the Supreme Court held that executive officers were removable at will even though by statute they must be "independent and, to the extent practicable, not subject to political pressure." 606 U.S. at 770 (quoting 42 U.S.C. § 299b-4(a)(6)). The Court held that this language may serve other purposes, such as encouraging the officers to "exercise independent judgment in formulating recommendations," *id.* at 776, and ensuring that they do not act as "mere agents or representatives of" third

parties, *id.* at 773. But when "Congress wants to depart from the default of at-will removability and instead furnish for-cause protection, it knows how to do so." *Id.* at 771 (collecting examples of explicit statutory removal restrictions). Congress' choice for statutory "silence preserves—rather than abrogates"—the background rule. *Novartis Pharmaceuticals Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024).

Plaintiffs' argument gets things exactly backwards. Plaintiffs argue that because Congress in other statutory schemes imposed for-cause removal restrictions to insulate executive agencies from the President's control, that "Congress was legislating against a settled background rule that provided for-cause removal protections for officers." Br. 25. That assertion simply cannot be squared with the principles explained in *Slaughter* and *Braidwood*—the general rule is that the President may remove his appointees at will, *Slaughter*, 146 S. Ct. at 2297, and any restriction on the removal power must be explicit in the statutory text, *Braidwood*, 606 U.S. at 771. Where Congress *does* impose a for-cause removal restriction, that may come with attendant notions of "notice and some opportunity to respond prior to [] termination." *See Trump v. Cook*, 146 S. Ct. 2234, 2251 (2026) (construing 12 U.S.C. § 242's explicit requirement of "remov[al] for cause by the President"). But because

Congress has not "impos[ed] any restriction on the President's power to remove" members of "the National Credit Union Administration," *Collins v. Yellen*, 594 U.S. 220, 249 (2021), they are removable at will.

Plaintiffs further err in suggesting that the statutory scheme is devoid of any meaning if the NCUA's members are removable at will. Br. 33. That ignores Congress' choice to establish the Board as a multimember entity with overlapping terms for its members, partisan-balancing requirements, consideration of financial experience, and independence from the regulated credit unions. *See* 12 U.S.C. § 1752a. By choosing to create a multimember Board—rather than a single agency head—Congress chose to foster "diverse perspectives and different points of view among the" NCUA Board, thus "mak[ing] it more likely that the costs and downsides of proposed decisions will be more fully ventilated." *PHH Corp. v. CFPB*, 881 F.3d 75, 184 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting). Those structural features continue to be shared with other multimember agencies like the Federal Trade Commission, the National Labor Relations Board, and the Merit Systems Protection Board, even if the officers who lead those agencies are directly accountable to the President. *See Slaughter*, 146 S. Ct. at 2310; *Harris*, 160 F.4th at 1242.

In all events, there is no reason to contort the statutory text to infer a removal restriction that does not exist when the Court's "task is to seek harmony, not to manufacture conflict," when "legislation and the Constitution brush up against each other." *United States v. Hansen*, 599 U.S. 762, 781 (2023). The canon of constitutional avoidance serves to confirm that there is no atextual removal restriction here, and there is no "canon of constitutional collision" that compels plaintiffs' reading. *Id.* (quotation marks omitted).[1]

## II. The NCUA Is Not The Federal Reserve

Plaintiffs recognize that if the Court were to infer removal restrictions into the statutory text, then those restrictions would almost certainly be "contrary to the separation of powers enshrined in the Constitution." *Slaughter*, 146 S. Ct. at 2291. So plaintiffs assert that the NCUA—an agency that oversees certain credit unions that obtain a federal charter or insurance—is the equivalent of the Federal Reserve, Br. 35-40, whose removal restrictions were upheld in *Cook*, 146 S. Ct. at 2254-55.

[1] Plaintiffs also insist that the Court should preserve any implied removal restrictions by excising all executive power wielded by the NCUA. Br. 44-46. This Court already rejected that proposed severance of executive functions in *Harris*, explaining that "the appropriate resolution here is to disregard the statutory removal restrictions for" the agency's principal officers, "not to blue-pencil provisions from among the full panoply of the executive powers of each agency." 160 F.4th at 1257.

That comparison does not hold. "The Federal Reserve is a uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States," *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025), and its "special arrangement [is] sanctioned by history," *Cook*, 146 S. Ct. at 2255. That singular tradition does not extend to *all* federal financial regulators or other federal agencies involved in financial markets, of course. The Secretary of the Treasury does not enjoy political insulation from the President even though the Secretary's decisions regarding Treasury securities can affect interest rates or the implementation of monetary policy.

Nor does it extend to the Office of the Comptroller of the Currency, which oversees and regulates the operations of federally chartered banks. *See Blanton v. Office of the Comptroller of the Currency*, 909 F.3d 1162, 1165-67 (D.C. Cir. 2018). As James Madison explained when the Comptroller's office was originally created, as a policy preference "there may be strong reasons why an officer of this kind should not hold his office at the pleasure of the Executive branch," but the Constitution demands that these executive officers must "be dependent upon the President because [they] can be removed by him." 1 Annals of Cong. 612; *accord Collins*, 594 U.S. at 253 n.19 (explaining that the Comptroller was removable at will).

And it similarly does not extend to the Federal Deposit Insurance Corporation, which like the NCUA lacks any textual restriction on the President's removal authority, 12 U.S.C. § 1812, and includes among its members the Comptroller of the Currency and the CFPB Director, both of whom the Supreme Court has definitively explained are removable at will, *see Seila Law*, 591 U.S. at 227 & n.10, 238.

The Federal Reserve is unique in that it follows in the footsteps of the First and Second Banks of the United States, entities recognized by the Founders as having a peculiar need for political insulation given their ability to create stable paper money. As Alexander Hamilton explained in his report to Congress, the Bank of the United States would be able to supply widely accepted paper notes and thereby "serve[] to counteract that rigorous necessity for" gold and silver. 3 The Works of Alexander Hamilton 142 (Henry Cabot Lodge ed., 1885). Without such a bank, the Nation would be forced to rely primarily on specie for money, which would be "an inadequate medium" when easier access to money could support industry and "correct[] a wrong balance of trade." *Id.* at 143-44. Without paper notes "in general currency," the logistics of moving money would stymie trade among the states and "operations of the treasury." *Id.* at 150. That was a critical monetary innovation at the Founding, as citizens could not

"tell a day's journey from the [local] bank whose paper he carried whether it would be accepted and serve him as money or not." 4 Woodrow Wilson, A History of the American People 46 (1902). Thus, Congress provided that the Bank's notes would be assignable and obligatory, Act of Feb. 25, 1791, ch. 10, § 7, 1 Stat. 191, 195, and that the notes "shall be receivable in all payments to the United States," *id.* § 10, 1 Stat. at 196.

The Federal Reserve was established to achieve the same fundamental objectives. *See Cook*, 146 S. Ct. at 2243-45. After the charter of the Second Bank lapsed in 1836, the United States experienced decades of uncertain economic fluctuation and financial panics driven by illiquid capital assets and runs on banks. Roger Lowenstein, America's Bank: The Epic Struggle to Create the Federal Reserve 2-3, 11-20 (2015). These recessions were exacerbated by the federal government's inability to centralize its funds without a national bank. Benjamin Haggott Beckhart, Federal Reserve System 14-15 (1972). Instead, for many years federal funds were kept in various "strongboxes" spread across country, resulting "in purposeless hoarding of cash by the government, [and] the 'haphazard contraction and expansion of bank reserves without reason, intent or policy.'" *Id.* at 15. One of the most significant panics occurred in 1907, when multiple banks across the country ran out of reserves and even

massive personal loans from J.P. Morgan failed to quell the unrest. Lowenstein, *supra*, at 59-76; *Cook*, 146 S. Ct. at 2244.

Congress responded by enacting the Federal Reserve system. Just as Congress created the Bank of the United States to provide for broadly accepted paper notes that could meet the country's demand for money, so too did Congress create the Federal Reserve "to furnish an elastic currency." Pub. L. No. 63-43, 38 Stat. 251, 251 (1913). Federal Reserve banks would provide paper money that could be more easily loaned and moved than physical gold and silver, and this money supply could expand and contract in response to the country's economic demands. It would also ensure that the dollar would more easily retain its value across the country. Beckhart, *supra*, at 23 (explaining that previously, "[t]he San Francisco dollar might be at a discount in terms of the New York dollar" because of "the cost of shipping currency," leading to "a toll on domestic commerce"). Like the Bank's notes, Federal Reserve notes were originally backed by specie and would be honored by the United States for debts. 38 Stat. at 265.

*Cook* thus held that "the Federal Reserve maintains the balance struck by the founding generation under modern circumstances," and that this Founding-era exception to the general rule of at-will removal by the President continued to apply to the Federal Reserve's Board of Governors.

146 S. Ct. at 2254 (quotation marks omitted). That holding is properly understood not to apply to all federal financial regulators. *See Slaughter*, 146 S. Ct. at 2306 n.5; *Seila Law*, 591 U.S. at 202-05. Instead, it uniquely applies to the Federal Reserve, which uniquely follows in the "lineage" of the Banks of the United States. *Cook*, 146 S. Ct. at 2254.

## III. The District Court Erred In Ordering Plaintiffs' Reinstatement To Office

Because Congress has not imposed any restrictions on the President's ability to remove NCUA Board members, and because any inferred restrictions would be unconstitutional, the district court plainly erred in ordering plaintiffs' reinstatement to office. That conclusion is reaffirmed by the Supreme Court's discussion of reinstatement in *Cook*.

*Cook* explained that "courts of equity would 'not interfere by injunction to determine questions concerning the appointment of public officers or their title to office.'" 146 S. Ct. at 2250. Instead, a court's equitable powers were limited to orders allowing an officer to proceed "*de facto*, * * * pending a litigation at law to determine their title." *Id.* (quotation marks omitted). "Put another way, a court of equity" could issue injunctive relief to allow a plaintiff to "remain in office during the pendency of litigation," but the court of equity "could not finally determine whether a plaintiff was validly removed." *Id.* Thus, the district court's order granting

plaintiffs "injunctive relief" was in error. JA96; *accord* Opening Br. 28 ("It is * * * well settled that a court of equity has no jurisdiction over the appointment and removal of public officers.") (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888)).

The only avenue of remedy available to plaintiffs would be through "*quo warranto* or mandamus," which are remedies at law. *Cook*, 146 S. Ct. at 2250. Plaintiffs disclaim any need to pursue an action for quo warranto. Br. 52-53. And while the district court did not reach the issue of mandamus, it noted that other district courts had found mandamus warranted to reinstate removed members of the National Labor Relations Board and the Merit Systems Protection Board. JA96 n.8. This Court, of course, reversed those decisions on the merits. *Harris*, 160 F.4th at 1257.

In all events, mandamus would not be an appropriate remedy here, as the writ of mandamus "will issue 'only where the duty to be performed is ministerial,'" *13th Regional Corp. v. U.S. Department of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980), and there is a "clear and indisputable right to relief," *Illinois v. Ferriero*, 60 F.4th 704, 714 (D.C. Cir. 2023), *i.e.*, that plaintiffs are insulated from removal by the President. Plaintiffs simply cannot overcome this threshold burden, because their theory of an inferred removal restriction—inconsistent with the Constitution's separation of

powers and the relevant precedent— is "not clearly mandated by statutory authority or case law." *Id.*

## CONCLUSION

The Court should reverse the judgment.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
LAURA E. MYRON
*/s/ Daniel Aguilar*
DANIEL AGUILAR
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because it contains 3,120 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Georgia, a proportionally spaced typeface.

*/s/ Daniel Aguilar*
Daniel Aguilar